Richmond HARRIS and Rose-Marie A.
Harris, Appellants,

v.

Jerome S. WAGSHAL, Appellee.

Tom A. PERKINS et al., Appellants,

v.

Jerome S. WAGSHAL, Appellee.

Jerome S. WAGSHAL, Appellant,

v.

Tom A. Perkins and Ann B. PERKINS
et al., Appellees.

Nos. 7574, 6695 and 7575.

District of Columbia Court of Appeals.

Argued Oct. 22, 1974.

Decided July 24, 1975.

Rehearing Denied Aug. 26, 1975.

Jacob Sheeskin, Rockville, Md. with whom Linda D. Schwartz, Rockville, Md. was on the brief, for appellants in No. 7574.

Richmond and Rose-Marie Harris filed a brief, pro se.

Jerome S. Wagshal, pro se.

William F. Reed, Washington, D. C., for Tom A. Perkins and others.

Before KERN and NEBEKER, Associate Judges, and QUINN,* Associate Judge, Retired.

PART I (No. 7574)

PER CURIAM:

Appellants (the Harrises) bring this appeal from a judgment (a) holding them personally liable on a judgment earlier obtained by appellee (Wagshal) against Georgetown Chateaux, Inc. (hereafter Chateaux), a corporation wholly owned by Mrs. Harris, and (b) awarding $10,000 punitive damages against them in favor of appellee. Appellants contest (1) the correctness of the trial court's decision to pierce the corporate veil of Chateaux and (2) the propriety of the trial court's assessment of punitive damages under the circumstances here. They also assert that they were denied a fair trial by reason of the trial court's bias against them.[1] We find no error and therefore affirm the judgment.

Two separate appeals by different parties have been taken from a single judgment rendered by the trial court. *See* Part II, *infra*. The appeals raise separate though related issues, and this portion of our opinion addresses only those parts of the judgment challenged in appeal No. 7574.

An understanding of the issues presented here requires a brief review of the factual background of the case. The litigation began when appellee Wagshal foreclosed on property owned by Chateaux and subject to a deed of trust held by him, and then secured a deficiency judgment against the corporation.[2] Finding that for practical purposes Chateaux was insolvent, Wagshal

---

* Judge Quinn heard argument in these cases but his death occurred before publication of this opinion.

1. The Harrises also claim that the trial court erred in holding that Wagshal's judgment was a lien on the option to purchase, which is the primary focus of the litigation between these parties. That contention is discussed in *Perkins v. Wagshal* (Nos. 6695 and 7575, *infra* Part II), so we need not reach it here.

2. The judgment was in the amount of $36,-692.82 plus interest but it is not the subject of any appeal.

instituted suit to hold the Harrises personally liable for the corporate debt, alleging that Chateaux was a sham corporation. Simultaneous proceedings to discover the assets of Chateaux revealed to appellee that Mrs. Harris owned an option to purchase properties at 3141 and 3143 N St., N. W., at a price considerably below their market value.[3] It was later learned that the option, granted to Mrs. Harris individually in 1968, had on the date of its creation been assigned to Chateaux and then back to Perkins and Schwab, the grantors of the option (and whose roles in this complex transaction are fully described in Part II of this opinion which disposes of Nos. 6695 and 7575 on appeal), as security for a $3,000 note issued by the corporation to cover money loaned to Mrs. Harris by Perkins and Schwab. These actions were part of a larger transaction in which Perkins and Schwab provided funds for the Harrises to execute a prior option they held on the N Street properties, immediately taking back a transfer of the properties and giving Mrs. Harris a lease and option in return. Chateaux became involved because Mrs. Harris found it necessary to borrow from Perkins and Schwab an additional $3,000 and only the corporation could legally pay the 15% interest demanded. The option was transferred to the corporation so that it could in turn be pledged to Perkins and Schwab to secure the $3,000 loan.

Before Wagshal became fully aware of these events Perkins and Schwab canceled the option, giving back to Mrs. Harris individually another lease and a new option, this one made expressly nontransferable.

Nonetheless, that option was shortly thereafter transferred, with the consent of Perkins and Schwab, to Mrs. Harris' brother in Switzerland.[4]

When these facts came to light Wagshal broadened his suit, joining Perkins and Schwab as defendants. He charged a fraudulent conveyance by the Harrises to Perkins and Schwab in the cancellation of the option, and sought reformation of the option and its sale in satisfaction of his judgment. The trial court found for Wagshal on each of those claims.[5]

The crux of this complex litigation is Wagshal's attempt to satisfy his judgment against Chateaux. Since the only known valuable asset of the corporation or of the Harrises is the option, the focus of the case has been Wagshal's attempt to have the option attached and sold. In appeal No. 7574, however, we are concerned only with the propriety of the trial court's order holding appellants *personally* liable for the judgment debt of Chateaux and awarding appellee $10,000 punitive damages against the Harrises because of their attempts to conceal the existence of the option.

**A**

Georgetown Chateaux, Inc. is a small, closely held corporation, with Mrs. Harris the sole stockholder,[6] and she and Mr. Harris were the only active participants in the corporation's business. Formed for the purpose of buying and selling real estate, Chateaux had a capital contribution of only $1,000, none of it in cash.[7]

---

3. The option price was $138,714.00. In 1972 the buildings were appraised at $154,500.00, and one of their owners, Perkins, estimated that they may have been worth more.

4. This second option was later canceled as a result of the Harrises' default on their obligations under the lease of which the option was a part.

5. The finding of fraudulent conveyance is challenged by Perkins and Schwab in Nos. 6695 and 7575, *infra. See* note 1, *supra.*

6. Mrs. Harris held the stock in secret trust for her husband. It can be inferred from the evidence that stock ownership was taken in this form because of judgments outstanding against Mr. Harris.

7. The $1,000 consisted of $250 in "pre-organization expenses" and $750 as the stated value of a contract covering a parcel of land which was assigned to the corporation.

The trial court made the following findings of fact in support of its conclusion that Chateaux was a sham corporation and an alter ego of the Harrises: (1) the corporation was established to insulate the real estate manipulations of the Harrises from the just claims of their creditors;[8] (2) it was inadequately capitalized and chronically insolvent; (3) the Harrises were its sole beneficial owners and virtually its sole operators;[9] (4) personal and corporate funds were consistently commingled in disregard of separate fiduciary accounting; (5) the corporation had no telephone number or address apart from that of the Harrises, and owned no personal property, and (6) there was substantial disregard of corporate formalities. Based on the totality of these factors, the court found that law and equity required disregard of the corporate entity.

▮▮▮ After review of the record we are satisfied that these findings are supported by the evidence and are not plainly wrong. We are persuaded as well that these facts provide sufficient legal foundation for the remedy ordered by the trial court. The general rule, of course, is that a corporation is regarded as an entity separate and distinct from its shareholders. *McAuliffe v. C and K Builders, Inc.,* D.C. Mun.App., 142 A.2d 605, 607 (1958). Where, however, the corporate form is a mere sham and is used by those in control to work injustice, it will be disregarded. *Burrows Motor Co. v. Davis,* D.C.Mun. App., 76 A.2d 163, 165 (1950); *Francis O.*

*Day Co. v. Shapiro,* 105 U.S.App.D.C. 392, 396, 267 F.2d 669, 673 (1959).

▮▮▮ In the instant case, appellants urge that merely because they were the sole owners of the corporation, or that they conducted its business from their home, is not sufficient to justify disregard of the corporate entity and this contention is correct. *See Peoples Mortgage Corp. v. Bedrosian,* 81 U.S.App.D.C. 69, 154 F.2d 332 (1946). We recognize that formation of a corporation in order to avoid personal liability is not itself, standing alone, an abuse of the corporate form. Here, however, we have evidence supporting a number of findings, *viz.,* that the corporation was formed to protect the Harrises' business from the claims of Mr. Harris' judgment creditors (a fact providing some evidence of fraudulent use of the corporation and of its use as a personal instrumentality), that Mrs. Harris extensively commingled corporate with personal funds, and that the formalities of the corporate form were in large part disregarded. Taken together, the findings support the conclusion that the corporation had no independent existence, but was used as the personal instrumentality of the Harrises.[10] The order piercing the veil of the corporation was therefore appropriate.

▮▮▮ We also reject the Harrises' contention that in order to pierce the corporate veil there must be a showing of fraud directly tainting the obligation on which the plaintiff is suing, directed against

---

8. The record reflects the existence of judgments against Mr. Harris only.

9. The court found that others whose names were associated with the corporation were only "nominal parties" and "window dressing".

10. The circumstances surrounding the transfer of the option to Chateaux provide a striking indication of the extent to which the Harrises themselves regarded the corporation as a sham. Although the option was part of a transaction between Perkins and Schwab and Mrs. Harris individually, it was trans-

ferred to the corporation for the sole purpose of making it available as security for payment by the corporation of an otherwise usurious rate of interest on what was in fact a personal obligation of Mrs. Harris. The agreement governing the pledge of the option back to Perkins and Schwab was signed by Mrs. Harris in her individual capacity. When the option was canceled for default on the note, the letter was sent to Mrs. Harris personally, without mention of the corporation. These facts show the extent to which the Harrises utterly failed to distinguish between the corporation's business dealings and their own.

Wagshal or his predecessor in interest. A similar claim was made and rejected in *Francis O. Day Co. v. Shapiro, supra,* in which the court refused to require proof of an improper or prejudicial transfer of assets from the defendant corporation *after* its dealings with the plaintiff. *Id.* at 395, 267 F.2d at 672. Indeed, it is not always necessary to allege fraud; other considerations of equity and justice can justify piercing the corporate veil. *Id.* at 396 n. 11, 267 F.2d at 673 n. 11.[11]

B

The trial court based its assessment of punitive damages against the Harrises on its findings that they had purposefully concealed the option from the court with intent to defraud Wagshal. This concealment consisted of the fact that Mrs. Harris, at oral examination to discover the assets of Chateaux, produced in response to a subpoena a copy of the lease and option on the N Street properties, but *failed* to produce either the assignment of the option to Chateaux or the agreement governing its assignment back to Perkins and Schwab; in addition, Mrs. Harris denied under oath that the corporation had any

interest in those properties. The court also found that the Harrises had "induced, acquiesced in and suffered" the cancellation of the first option for the purpose of preventing Wagshal from reaching it.

■ An award of punitive damages must be based on willful and outrageous conduct. *Franklin Investment Co. v. Homburg,* D.C.App., 252 A.2d 95, 98 (1969); *District Motor Co. v. Rodill,* D.C.Mun. App., 88 A.2d 489, 492–93 (1952). Proof of fraud or deceit is itself sufficient to support an award of exemplary damages, since fraud necessarily encompasses malice. *District Motor Co. v. Rodill, supra.* In the instant case, the trial court found "from substantial and convincing proof" that the Harrises had purposefully acted with intent to hinder and defraud Wagshal in his efforts to satisfy his judgment against Chateaux.[12] Given the deference which must be accorded the trial judge in assessing the credibility of the witnesses and in divining the intent of the parties, *see United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949), we cannot say, after review of the record, that the court's findings are plainly wrong.[13]

11. The inadequacy of Chateaux's original capitalization provides an additional support for the court's ruling in this case. "An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, has frequently been an important factor in cases denying stockholders their defense of limited liability." *Francis O. Day Co. v. Shapiro, supra* at 396, 267 F.2d at 673, quoting *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793 (1944). We agree with the trial court that $1,000, none of which was in cash, is inadequate capitalization for a corporation contemplating real estate ventures of the magnitude undertaken by Chateaux.

12. We find no merit in the Harrises' contention that the trial court found only that their actions were contemptuous toward the court, and that the award of damages was an improper attempt to punish them for contempt. This argument ignores the fact that the court also found an intent to defraud Wagshal, and that this finding was the predicate for the

assessment of damages. No penalty was in fact imposed for contempt.

13. When a sufficient legal foundation exists for the award of punitive damages, the decision whether to award damages lies with the trial court sitting as the trier of fact. *United Securities Corp. v. Franklin,* D.C. Mun.App., 180 A.2d. 505, 511 (1962). We find no abuse of discretion in the trial court's conclusion that the Harrises' conduct was sufficiently "wanton and outrageous" to warrant imposition of damages.

Nor do we feel that the amount of the award was grossly excessive. Since the purpose of punitive damages is to punish and deter intolerable conduct, we do not find it inappropriate to assess damages in a case such as this in proportion to the sum hoped to be gained by the fraud. *See Franklin Investment Corp. v. Homburg, supra* at 99. Measured by this standard, we do not find the award unreasonable.

The Harrises also argue that it is improper to award punitive damages in the absence of

The Harrises challenge the award of punitive damages against them jointly and severally, asserting that the only conduct upon which damages could be predicated was that of Mrs. Harris individually. Thus, they argue, there was no factual basis for the award against Mr. Harris. This view ignores the fact that the trial court found that both Harrises were aware of Wagshal's claim against them and against the corporation, both realized the value of the option, and both concealed the option from the court and from Wagshal. These findings are supported by the evidence. Although it was Mrs. Harris who testified falsely about the option, the subpoena duces tecum which commanded the production of the papers relating to the assignment of the option[14] was directed at both Harrises. Mr. Harris was therefore a party to the withholding of that information.[15] In addition, the record is quite clear that Mr. Harris was an active participant in all stages of the transactions concerning the option, including its assignment to the corporation and pledge back to Perkins and Schwab. We find no error, therefore, in the award against both appellants.

### C

Appellants finally assert that the trial judge was biased against them. In support of this contention they point to an unusual turn of events which occurred after judgment had been entered in this case. The trial judge informed the parties that he had just learned from his mother-in-law that Mr. Harris had several years previously sold her a house and "dealt rather sharply" with her.[16] In a statement placed in the record, the trial judge stated he had been aware of his mother-in-law's experience at the time of its occurrence, but did not know the name of the agent involved and had not connected Mr. Harris to those events until the matter was brought to his attention by his mother-in-law *after the entry of judgment.* Under these circumstances, the judge was able to state firmly that the prior experience of his mother-in-law had no effect upon his decision in the instant case.

■ A judgment will be reversed if the judge entering it is so biased against or hostile to one of the parties as to deprive that party of a full and fair trial. *Schwier v. Schwier,* D.C.App., 207 A.2d 115 (1965); *Silverman v. Silverman,* D.C.Mun.App., 162 A.2d 773 (1960). We find no such bias in this case. The Harrises concede there is no "direct" evidence that the trial judge knew, during the trial, of Mr. Harris' connection with his mother-in-law. Rather, they assert only that the judge

---

any compensable damage to Wagshal resulting from the fraud. Since Wagshal has made no claim for compensatory damages in this action, we express no opinion as to whether he has suffered any. Nonetheless, punitive damages may be imposed even in the absence of compensatory damages. *United Securities Corp. v. Franklin, supra* at 511.

14. The subpoena called for the following documents:

 3. All records of real property owned within or outside of the District of Columbia, directly or indirectly, in whole or in part, by Chateaux or by the Harrises.
 4. All records and inventories of personal property owned within or outside of the District of Columbia, directly or indirectly, in whole or in part, by Chateaux or by the Harrises.

 \* \* \* \* \*

14. Copies of all written agreements by which Chateaux or the Harrises or any corporation in which the Harrises are the sole stockholders, have an expectation, contingent or otherwise, to be paid money or to receive real or personal assets in the future.

15. We need not reach the question whether Mr. Harris could be held liable in an agency theory for the acts of his wife. *See Washington Garage Co. v. Klare,* D.C.App., 248 A.2d 681 (1968); *District Motor Co. v. Rodill, supra* at 494. The trial court did not base its order on a finding of agency, but rather on Mr. Harris' actions as a principal.

16. In his memorandum for the docket which described these events, the trial judge stated that his opinion at the time had been that she was "fleeced by a disreputable real estate agent and contractor."

may have been biased against "real estate agents and contractors in general." This charge is totally unsupported by the record.

 The Harrises point to three factors to support their charge of bias. Two of those factors, the award of punitive damages and the award of damages against both the Harrises, we have found to be supported both in law and in fact. In addition, they point to the court's directing entry of the judgment holding the Harrises liable for Chateaux's judgment nunc pro tunc as of August 31, 1971, the date of the filing of Wagshal's suit against the Harrises personally.[17] While the action is unusual we do not find it indicative of prejudice.[18] Rather, it was a result of the trial court's additional holding that the Harrises had effected a fraudulent conveyance of the option. The court's purpose seems to have been to protect Wagshal against any prior alienation, still unknown to Wagshal, or lienable property of the Harrises which could be used to satisfy the corporate debt. The action would therefore be a response to the conduct of the parties at issue in the litigation, not the product of the court's pre-existing bias. As such, it is not grounds for reversal.[19]

We find no merit in any of appellants' assignments of error. Accordingly, those portions of the judgment appealed from in this case are affirmed.

PART II
(Nos. 6695 and 7575)

The Perkinses and the Schwabs[20] appeal from that part of the order of the trial court which entitled appellee Wagshal to the reformation of an option. That option, granted to Mrs. Harris and assigned to Chateaux, had been pledged by the corporation to secure a debt owed to Perkins. Perkins foreclosed on this security by canceling the option. These appeals are from the trial court's holding that the purported cancellation was a nullity because of a prior lien that had attached to the property right in the option when Wagshal recorded a judgment against Chateaux. The court also purportedly nullified the foreclosure by holding that it constituted a fraudulent conveyance under D.C.Code 1973, § 28–3101. We reverse the holding on the lien issue and order a new trial on the fraudulent conveyance issue.[21]

The factual background of the case is recounted in Part I, *supra,* and will not be restated here. The events of primary sig-

17. The order also stated, somewhat gratuitously, that it could be filed with the Recorder of Deeds so as to effect a lien on any real estate interest of the Harrises in the District.

18. The entry of the order nunc pro tunc was raised in this case solely in the context of the bias claim, and no direct attack has been made on it. We do not find it necessary or appropriate to consider the validity of that procedure. Appellants do not claim to have been prejudiced by the order itself, and neither party has suggested that there exists an innocent party whose rights have been affected by it.

19. In the federal courts, disqualifying bias must stem from an extrajudicial source rather than from opinions formed by the judge as a result of his participation in the case. *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). We referred to the federal standard of disqualification with approval in *Woodard*

*v. City Stores Co.,* D.C.App., 334 A.2d 189, 192 (1975).

20. Mrs. Perkins and Mrs. Schwab were minimally involved in these ventures, and Mr. Perkins served as the active business representative of both the Perkins and the Schwab interests. Reference to Perkins hereinafter denotes the "Perkins-Schwab" interests.

21. Wagshal appeals (No. 7575) from the reformation remedy afforded him at trial, claiming that the rents from the date when the option was originally exercisable should be credited to the party exercising the option. Due to our disposition of the case, we do not reach this issue which now must be ruled on again at retrial of the frudulent conveyance question. We also decline to consider whether under D.C.Code 1973, § 15–102, a lien attached to the second lease and option, that issue being raised for the first time on appeal.

nificance to the instant appeals occurred in early January of 1972. On Monday, January 3, Perkins and Mrs. Harris discussed the lease and option on the N Street properties and whether they would be renewed. Wagshal's name apparently was not mentioned. On January 6, 1972, the Harrises were scheduled to appear pursuant to subpoena at an oral examination to discover the assets of Chateaux. They appeared with documents concerning the sale and leaseback transaction. The option was mentioned in these documents but its assignment to Chateaux and subsequent pledge to Perkins were not mentioned.

On the evening of January 6, Wagshal called Perkins and inquired about the status of the option, the existence of which he had assertedly just learned earlier in the day. Wagshal also inquired about purchasing the N Street properties, and a meeting between Wagshal and Perkins, apparently to discuss a sale, was scheduled but never held. Perkins claims to have written letters to Berks Title Co., where the option was being held in escrow, and to Mrs. Harris notifying both parties of his intent to cancel the option—or foreclose on his security—on January 6, although for some reason those letters were dated January 7. It appears that no mention of such intended cancellation was communicated to Wagshal on the evening of January 6.

On the evening of either January 7 or January 8, Perkins and Mrs. Harris had another telephone conversation during which they discussed Wagshal's call to Perkins on January 6. Mrs. Harris reluctantly testified that she had written down the following questions to ask Perkins:

Does Mr. Wagshal know about canceling the option? Did he intimate it?

How does Mr. Wagshal know about the option being held in escrow?

Perkins again assured Mrs. Harris that he would not sell the N Street properties to Wagshal.

On Monday, January 10, Mrs. Harris specifically denied that Chateaux had any interest in the option. On this same day Perkins hand-carried his cancellation letter dated January 7, 1972, to Berks Title Co. and thereby retrieved and canceled the option. Subsequently, Perkins and Mrs. Harris negotiated a second lease and option. Mrs. Harris eventually assigned this second option to her brother in Switzerland. She later defaulted on the new lease and Perkins took possession of the N Street properties.

At trial, Wagshal sought to establish access as a creditor to the option by means of two theories. First, he urged that the recordation of his judgment served to create a lien on the option pursuant to D.C. Code 1973, § 15–102. Second, he urged that the cancellation of the option by Perkins be declared a nullity as a fraudulent conveyance under D.C.Code 1973, § 28–3101. The court held for Wagshal on both theories. The two holdings will be reviewed in order.

A

*Did the Filing of Wagshal's Judgment Create a Lien on the Option Held by Chateaux?*

D.C.Code 1973, § 15–102, provides that as of the date it is recorded a final judgment of the Superior Court constitutes a lien "on all the *freehold and leasehold estates, legal and equitable,* of the defendants bound by [such judgment,] . . . in any land, tenements, or hereditaments in the District of Columbia, whether the estates are in possession or are reversions or remainders, vested or contingent. . . ." (Emphasis supplied.) The trial court reasoned that the option was an equitable "estate or interest" under section 15–102 because it permitted the conversion of a leasehold interest into a freehold interest at the expiration of the lease. Whether an option to purchase real property is correctly classified as an equitable or legal free-

hold or leasehold estate is a question of first impression in this jurisdiction. We answer it in the negative.

We have looked to the law of other jurisdictions for guidance on this issue. In *State v. New Jersey Zinc Co.,* 40 N.J. 560, 193 A.2d 244 (1963), the Supreme Court of New Jersey was called upon to determine whether the owner of an unexercised option on property had standing to participate in a condemnation action. To have such status, a party was required to show an interest[22] in the property. In concluding that the unexercised option did not amount to such a property interest, the court examined "the nature and effect of an option to purchase realty", and stated:

> [The optionee] has nothing but a continuing, irrevocable proposal to sell him the property, which will not ripen into anything more unless and until he exercises it, which he may do or not entirely as he pleases. An option does not create any interest in the land, 3 American Law of Property § 11.17 (1952) . . ..
> [40 N.J. at 576, 193 A.2d at 252.]

Other eminent domain cases have similarly denied the holder of an unexercised option the status of one possessing an interest or estate in the condemned property. *See, e. g., Haney v. Denny,* 135 Ind.App. 317, 193 N.E.2d 648 (1963); *Cornell-Andrews Smelting Co. v. Boston & P. R. Corp.,* 209 Mass. 298, 95 N.E. 887 (1911). In the latter case a leaseholder with an option to purchase sought compensation for the diminution in value of all his rights under the lease including the option. The court stated:

> . . . [T]he real objection to this contention is that although the insertion in a lease of an option giving to the lessee at his option a right to buy the fee

adds to the value of the lessee's rights under the lease, it is no part of the lessee's estate in the land. It is a contract right and nothing more, although contained in the lease[23] and although it is a contract right which passes to an assignee of the lease. . . . The lessee's rights under such an option are rights which lie in contract and do not create in the lessee any estate in the land. . . . [209 Mass. at 306, 95 N. E. at 890.]

Although the preceding cases arose in the context of eminent domain proceedings, we are persuaded by the presence of similar language in other contexts that they correctly state a general rule suitable for application in the instant case. In deciding that the holder of an unexercised option was not an "equitable owner" entitled to a tax exemption, for example, the court in *Gautier v. Lapof,* 91 So.2d 324 (Fla.1956), relied upon 32 Am.Jur. *Landlord and Tenant* § 300 in stating:

> [U]nder a lease with option to purchase the relation of the parties is merely that of landlord and tenant until the option is exercised, and the tenant has no estate in the land beyond the lease until he elects to purchase. [91 So.2d at 326.]

In another tax case, *Helvering v. San Joaquin Fruit & Investment Co.,* 297 U.S. 496, 498–99, 56 S.Ct. 569, 80 L.Ed. 824 (1936), the Supreme Court was faced with the task of determining the date on which respondent acquired certain property. Although the point was not dispositive of the case, the Court rejected the contention that ownership of an option created an interest in land, even when the option was embodied[24] in a lease. Similarly, the court in *Coons v. Baird,* 148 Ind.App. 250, 255, 265 N.E.2d 727, 731 (1970), quoting *Butsch v. Swallow,* 78 Ind.App. 101, 106,

---

22. Under section 15–102 an estate in real property rather than a mere interest is required.

23. In our case, the lease and the option were separate documents but part of a unitary sale and leaseback transaction.

24. *See* note 23, *supra.*

134 N.E. 877, 878 (1922), stated with approval the following general rule:

> "It has been many times held that an option to purchase gives no right of property in and to the thing which is the subject of the option. It is not a sale. It is not even an agreement for a sale. At most, it is but a right of election in the party receiving the same to exercise a privilege, and only when that privilege has been exercised by an acceptance does it become a contract to sell. . . ."

In light of the above authorities, we conclude that the trial court erred in holding that an option accompanying a lease was embraced by the statutory language of section 15–102, which applies to legal and equitable estates in land.

## B

### The Fraudulent Conveyance Issue

In alleging a fraudulent conveyance of the option, it is not the assignment of the option to Chateaux or its subsequent pledge as security by Chateaux which Wagshal challenges. Rather, it is the cancellation of the option by Perkins (which amounted to a foreclosure on his security) which Wagshal contends should be set aside.

While the most common claim of a fraudulent conveyance attacks the transfer of property by a debtor to a creditor or other party, the coverage of the statute is sufficiently comprehensive to include the induced foreclosure under a mortgage or other security interest, if accomplished fraudulently. *See Gurney v. Tenney,* 226 Mass. 277, 115 N.E. 313 (1917). Generally, any conveyance of property may be vitiated by fraud, and the form of the transfer is not controlling. 37 C.J.S. *Fraudulent Conveyances* § 33 (1943). *See Leonardo v. Leonardo,* 102 U.S.App.D.C. 119, 251 F.2d 22 (1958).

The trial court found that the Harrises "induced, acquiesced in and suffered the purported cancellation in January 1972 of the option to purchase 3141–43 N Street, N.W. (which was a legal asset of Georgetown Chateaux, Inc.) 'with intent to hinder and defraud persons having just claims or demands.' By the terms of Section 28–3101 of the D.C.Code (1967 Ed.) said transaction [the purported cancellation of the option] is therefore void as against Jerome S. Wagshal, a judgment creditor."

The above finding obfuscates more than it resolves. In the first place, the apparent conclusion that the foreclosure was a fraudulent conveyance must be read in the context of the trial court's entire opinion. Wagshal's claim raised two substantive issues—the lien issue discussed in Part II A and the fraudulent conveyance issue. It also included a prayer for punitive damages against the Perkinses, the Schwabs, and the Harrises. Having already decided the lien issue in favor of Wagshal, thereby entitling him to reformation of the option, the court stated:

> The remaining unadjudicated prayer . . . is for the assessment of punitive damages against all . . . defendants, Harrises, Perkins, and Schwab.

The court then proceeded to enumerate those factors which caused it to assess punitive damages against the Harrises, which findings we held to be supported by the record.[25] Concluding that discussion, the court declared the purported cancellation of the option void under D.C.Code 1973, § 28–3101, thereby making its sole reference to a fraudulent conveyance. That conclusion was thus inserted in the midst of the punitive damages discussion despite the previous clear statement by the trial court that Wagshal's right to reformation was no longer at issue.

The court then shifted its discussion toward deciding whether punitive damages should be assessed against the Perkinses

25. *See* Part I B, p. 288, *supra.*

and the Schwabs. In deciding against such an assessment, the court stated:

> The extent to which the Perkins-Schwab interests were knowingly involved in this scheme to hide the valuable option from the Court and thus defraud judgment creditor Jerome S. Wagshal is uncertain. The Court is fully persuaded that Thomas A. Perkins knew of Rose Marie A. Harris' intent to conceal the option and to preserve it as her own personal asset.

> Were the actions of the Perkins-Schwab interests during January and early February of 1972 primarily those of creditors concerned with the protection of their own economic interests? Or were they the actions of co-conspirators seeking to deceive this Court and its judgment creditors? Although legally ineffective (because of the prior lien on the option established by recordation of the judgment on August 12, 1971) [*see* Part II A, *supra*] the effort to cancel the original option in January might be considered a race for assets insufficient to satisfy all creditors. But how can the granting of a new lease and a new option on January 28, 1972, to Rose Marie A. Harris be explained? Or what was the motive for agreeing to the assignment of the new option to Mrs. Harris' brother in Switzerland? Many questions remain unanswered. The proof is not so clear that the Court can say with certainty that the Perkins-Schwab interests knowingly conspired with the Harrises to deceive this Court [26] or willfully participated in this scheme to defraud judgment creditors.

Failure to answer the above questions was in no way inconsistent with the court's punitive decision. It was, however, directly at odds with its holding that the foreclosure (or "purported cancellation") constituted a fraudulent conveyance. Neither the fraudulent intent of the Harrises nor mere knowledge by the Perkinses of this intent necessarily vitiated the transaction by Perkins, a previously secured party.

In *Hersh v. Levinson Bros.,* 117 N.J. Eq. 131, 174 A. 736, 738–39 (1934), the court, in discussing the protection that the law provides for a preferred creditor, stated:

> "When the conveyance is made to secure an antecedent debt or to discharge such a debt, it has been frequently held that even knowledge upon the part of the grantee that his grantor's purpose is to defeat other creditors will not be operative to vitiate the conveyance, providing the grantee did not actually participate in that purpose by making a reservation in favor of the grantor or in some other manner combining with the grantor to enable him to defeat his creditors." [27] *As to a conveyance made by a grantor actuated by such a fraudulent purpose, there is a well-recognized distinction between one who purchases for a present consideration and one who purchases in satisfaction of a pre-existing debt.* The former is in every sense a volunteer who, having no motive of interest prompting him to enter into the transaction, does so for the purpose of aiding the fraudulent purpose. So says the law if he knows of the fraudulent purpose of the grantor. *The latter has an interest to serve. He can keep out of the transaction only at the risk of losing his claim. The law casts upon him no duty of protecting other creditors. He has the same right to accept a voluntary preference that he has to obtain a preference by superior diligence. He may know the fraudulent purpose of the grantor, but the law sees that he has a purpose of his own to serve, and if he goes no further than is necessary to*

---

26. A matter clearly related only to whether punitive damages should be assessed against Perkins and unrelated to the fraudulent conveyance issue.

27. Quoting from *Atlantic Refining Co. v. Stokes,* 77 N.J.Eq. 119, 75 A. 445, *aff'd,* 78 N.J.Eq. 301, 81 A. 1132 (1911).

*serve that purpose, the law will not charge him with fraud by reason of such knowledge. . . .* [Citations omitted; emphasis and footnote supplied.]

*Accord, Hatheway v. Hanson,* 230 Iowa 386, 297 N.W. 824, 827 (1941); *Henney Buggy Co. v. Ashenfelter,* 60 Neb. 1, 82 N.W. 118 (1900); *Smith v. Whitman,* 39 N.J. 397, 189 A.2d 15 (1963). *See generally,* 37 Am.Jur.2d *Fraudulent Conveyances* §§ 87–89 (1968); Note to *Rice v. Wood,* 31 L.R.A. 609, 618–21 (Extra Annot.Ed. 1913).[28] It seems logical that the law should afford an already secured creditor who is induced to foreclose on his collateral at least the same protection it affords an unsecured creditor who accepts or obtains a preferential transfer as payment of or security for a valid preexisting debt.

■ If Perkins merely foreclosed on his security to protect himself, which possibility the court specifically recognized, the nullification of that foreclosure was unfounded. *See Gurney v. Tenney, supra.*[29] That Wagshal was prejudiced by the foreclosure was not sufficient reason in itself to declare it void. *See Murry Nelson & Co. v. Leiter,* 190 Ill. 414, 60 N.E. 851 (1901). Only if Perkins participated in the Harrises' fraudulent scheme could the foreclosure have been set aside.

■ The trial court posed the dispositive questions but chose to answer none of them. In short, the Opinion and Order fails to recite findings necessary to support its conclusion that the foreclosure was a nullity. Such a failure is not a jurisdictional bar to our review of the holding. Super.Ct.Civ.R. 52. *Cf. Urbain v. Knapp Brothers Manufacturing Co.,* 217 F.2d 810, 816 (6th Cir. 1954). We feel indisposed, however, to answer these questions in the first instance when the trial court, apprised of all the evidence and having viewed the witnesses, either felt constrained from doing so or felt that the answers were unnecessary in light of its previous disposition in Wagshal's favor on the lien theory. Wagshal correctly observes that the trial court was not required to find to a "certainty" that Perkins participated in a scheme to defraud Wagshal in order to declare the foreclosure a nullity. Our reading of the opinion in its entirety leads us to the conclusion, however, that reference to the "certainty" standard is explained by its context in a discussion solely related to punitive damages. It appears that the fraudulent conveyance issue was simply not addressed in any meaningful sense. We are not in a position to resolve this aspect of the case on appeal in order to determine whether, under some lesser standard of persuasion than "certainty", Perkins participated in some fraudulent scheme or whether he was only protecting his preexisting rights as a secured creditor. Such a determination must be made in a new trial.[30]

28. Wagshal urges that the above analysis is inapposite in light of D.C.Code 1973, § 28-3101, since that section states that if a purchaser for value has mere notice of his grantor's fraudulent intent, the conveyance will be set aside. We reject this argument. Section 28-3101 is modeled after the act of 13th Elizabeth, Ch. 5 (1570), which contained similar reference to notice. *See* District of Columbia Code Encyclopedia, § 28-3101, *Fraudulent Conveyance* (1967). The body of law in accord with *Hersh v. Levinson Bros., supra,* has evolved in compatibility with the English statute and similar succeeding statutes such as ours. The statutory language should therefore not be read as invalidating the widely accepted distinction discussed in *Hersh. See* Note to *Rice v. Wood, supra,* and cases cited at 618–21.

29. The validity of the underlying debt and security arrangement was never challenged.

30. While we would normally remand for findings under these circumstances, such a remedy is unavailable here. The trial judge discovered post-trial that a relative of his had experienced business difficulty with one of the parties. We seek to avoid the appearance of bias which a remand to the original trial judge might create by directing that any further proceedings be before another judge. *See* Part I, p. 11 note 16, and accompanying text.

**296**

Accordingly, the judgment in appeal No. 7574 is

*affirmed;*

and the judgment in appeal No. 6695 is

*reversed and the case remanded for further proceedings not inconsistent herewith.*