**Reginald WILLIAMS and Kathy Williams, Plaintiffs,**

v.

**CWI, INC., et al., Defendants.**

**Civ. A. No. 90–2839.**

United States District Court, District of Columbia.

Nov. 22, 1991.

Patricia A. Berlin, Washington, D.C., for plaintiffs.

Carolyn C. Eaglin, Alexandria, Va., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

This claim was brought by a young professional basketball player and his wife—

---

**3.** An implied covenant of good faith and fair dealing does not inhere in an at-will employ-    ment contract.

Reginald and Kathy Williams—against a financial advisor and his associated companies to recover $50,000 that the Williams had entrusted to the defendant, Waymon Hunt through one of his affiliated companies. Plaintiffs also seek to recover certain costs and expenses that they incurred as a result of Mr. Hunt's actions. Plaintiffs have also prayed for punitive damages.

Rather than using the $50,000 investment for the purposes designated by the plaintiffs, the defendant Hunt diverted the money for his own purposes. It is clear that the culprit in this saga is Mr. Hunt. Ms. Neeley, the other individual named as a defendant, will be dismissed from the suit because plaintiffs have not been able to meet their burden of proof to show Ms. Neeley's involvement in the scheme that separated the Williams from their $50,000. The case was tried before the Court without a jury.

## I. *Findings of Fact*

The facts clearly show that Reginald Williams, a gifted young professional basketball player, and his wife, Kathy, were unsophisticated in matters of finance and business. In the late 1980's, upon his graduation from Georgetown University where he had a distinguished career as a star basketball player, Mr. Williams signed a million-dollar-a-year contract with the Los Angeles Clippers, a National Basketball Association team. As a result of this lucrative contract, Mr. Williams and his wife were looking for opportunities to invest

part of Mr. Williams substantial earnings.[1] He was directed to Waymon Hunt, a financial planner, and his company, CWI, Inc., by his wife's parents who had met Mr. Hunt through Clara Neeley who had previously worked in a local bank near Mrs. Williams' parents' home. Ms. Neeley was working for Mr. Hunt by the time the Williams were introduced to him.

The Williams first met Mr. Hunt in June of 1988. At that time, they agreed that Mr. Hunt would provide the Williams with financial and tax advice, including preparation of the Williams' tax returns. At approximately that time, Mr. Hunt brought to the Williams' attention an opportunity for investment involving the purchase of a product styled atmospheric reverse refrigeration heating units (hereinafter referred to as "units").[2] Because of how these units were supposed to perform, they were represented as being capable of producing an investment return and tax benefits.

The Williams agreed to buy $1 million worth of these units through a Hunt affiliated company, Success Through Association ("STA"). In September of 1988, before the Williams decided to make the investment, STA had only $301.50 in its bank account. *See* Plaintiffs' Exhibit #4. The Williams did not know this at the time nor were they aware that STA was a Hunt operated and controlled company. The Williams agreed to purchase the reverse refrigeration units under the following terms:

1. Like many young professional athletes, Mr. Williams was earning a considerable salary but had no experience in making investments or managing his money. He needed reliable expert advice and did not find any readily available.

Because Mr. Williams' predicament appears to be a recurring problem for basketball players and other athletes who suddenly receive large disposable incomes, it seems that it would be appropriate for either the NBA, or the player's team, or the players' organization to develop a three-pronged program to assist these young people. First, they could offer at least some rudimentary education in business and finance. Second, they could assemble a package of low risk blue-chip investments for young players that will provide for their futures as well as a system for referring them to wise and ethical professionals who can advise them on managing money. Third, they might offer a financial incentive for players to place a portion of their funds in a deferred investment program. Perhaps the League and the players' association could even establish their own high-grade, low-risk investment fund. In this way, young athletes would be protected from highly speculative ventures like the one involved in this case.

2. Now that there doesn't appear to be any current market for the Brooklyn Bridge and the supply of swampland in Florida has been depleted, it appears that atmospheric reverse refrigeration heating units are the wave of the future in get-rich-quick schemes and tax dodges, if anyone can figure out what they do.

(a) The Williams would buy $1 million worth of units at a price of $10,000 each.

(b) The deal would be financed by a $50,000 down payment from the Williams and a loan to be arranged by STA for $950,000.

(c) STA was to serve as "non-exclusive agent for the purpose of leasing" the units.

(d) As agent, STA would "arrange for [the Williams] to receive confirmation of the purchase, financing and leases...." of the units. Plaintiffs' Exhibit 1, ¶ E.

(e) In the event that the purchase could not be made, STA was to "return [the Williams] deposit in full within one week of [STA's] determination that [the Williams'] criteria cannot be met, but in no event later than December 16, 1988." Plaintiffs' Exhibit 1.

Waymon Hunt agreed to arrange for the $950,000 in financing. The Williams signed a purchase agreement and forwarded $50,000 to STA, but no money was ever remitted to the purported manufacturer and seller of the units. Immediately upon STA's receipt of the $50,000, Hunt appropriated the money for his own use. Hunt did not obtain the $950,000 of financing.

Around the time of this transaction, there was an internal battle among the owners of the company that manufactured and sold the units, and the company was placed in receivership. While it later turned out that Mr. Hunt was able to contact a second seller and manufacturer, no purchase of the units ever came to pass. The parties have stipulated that the $50,000 sent to Mr. Hunt's company, STA, was never used to purchase reverse refrigeration units from any entity.

Mr. Hunt has attempted to deviate from the agreement he provided to the Williams, an agreement he drafted, by stating that he was entitled to the $50,000 as a finder's fee for locating financing for the project. He has produced two cashier's checks to show that he spent $68,000 on a fee he paid to a Georgia company, Aslanien Ltd., to obtain financing. He claims he did this on the Williams' behalf, but his testimony is not credible. While this Court cannot deny that Mr. Hunt may have discussed some financing for the purchase of the so-called reverse refrigeration units, it was clear he did not have the Williams in mind when he sent the first check for $34,000 to Aslanien, Ltd. since he wrote that check before the Williams ever signed a contract or purchase order for the units. It is not even clear that they knew about the investment opportunity before Hunt sent the check to Aslanien. Hunt admitted that the second check for $34,000 sent in November of 1988 was sent on behalf of other clients and not the Williams. It is clear that the $50,000 sent to STA by the Williams was to be a down payment on the units. It was not a finder's fee or any other kind of advance fee. Indeed Mr. Hunt conceded in his testimony before the Court that he owes the Williams the $50,000 they sent to him. Although he testified that he does not have the funds to pay the Williams now, he clearly acknowledges that under his agreement with them, he owes them the money.

■ The Williams are entitled to a judgment against Mr. Hunt on both contract and fraud theories. The contract provided that the money be repaid "if for any reason [STA] cannot fulfill [the Williams] request...." It is also clear that Mr. Hunt's actions with respect to the Williams prove that Mr. Hunt defrauded the Williams. Hunt flat out misappropriated the money given to him. He dissembled when the Williams periodically asked about their investment and its status. He said "things were going fine" when they were not. He never told them that the $50,000 had not been sent to the manufacturer, nor did he inform them that he had not obtained financing. Hunt misrepresented the status of the arrangement when he prepared the Williams' tax returns on which Hunt took certain deductions and credits that could only be taken if a transaction had in fact been consummated. The Williams incurred significant expenses because of Mr. Hunt's violation of the contract and fraudulent conduct. They are entitled to recover the following sums from Hunt:

(a) $50,000, the amount of the down payment that was not returned;

(b) $2,500, the amount paid to Mr. Christopher Moss to prepare amended tax returns for the Williams;

(c) $3,000, the amount paid to Mr. Gary Lu to prepare amended California state tax returns;

(d) $21,000 for the penalties and interest owed to the IRS as a result of the improper tax returns filed by Mr. Hunt;

(e) $4,300 for the penalties and interest owed to the California state government as a result of the improper tax returns prepared by Mr. Hunt;

(f) $3,000 in attorney's fees incurred by the Williams to address the problems created by Mr. Hunt's activities;

(g) $500 for Mr. Moss's expert witness fee; and

(h) $3,000 for the costs of this litigation. The Williams may not collect tax savings they claim they might have enjoyed had they received legitimate financial advice. It would be too speculative to assume post hoc what investments they might have chosen and what savings they might have received.

■ Plaintiffs have not sustained their burden against Ms. Neeley. She was present at the Williams initial meeting with Mr. Hunt, and she did sign the checks disbursing the $50,000. However, the Court credits her testimony in which she said that she did not know the money was being misappropriated nor did she have any definitive knowledge of the transaction between Hunt and the Williams. Most significantly, none of the $50,000 can be traced to Mrs. Neeley. In other words, Mrs. Neeley received none of the proceeds from the Williams' transaction with Mr. Hunt.

Finally, plaintiffs seek punitive damages. The Court finds that they are warranted in this case. Mr. Hunt's egregious behavior was utterly unworthy of someone who calls himself a professional. His fraudulent conduct put the plaintiffs at risk of committing tax fraud. In recognition of these facts, the Court will award $50,000 in punitive damages, an amount that reflects the $50,-000 down payment that was misappropriated and that was the basis for the grievous errors made on the Williams tax returns and caused them to incur substantial costs and expenses. The District of Columbia Court of Appeals has found it appropriate "to assess [punitive] damages ... in proportion to the sum hoped to be gained by the fraud." *See Harris v. Wagshal*, 343 A.2d 283 (D.C.App.1974).

## II. *Conclusions of Law*

1. The defendant, Mr. Hunt, breached his contract with the plaintiffs. He should have returned their $50,000 and did not.

2. The defendant has defrauded the plaintiff in that he

(a) took money under false pretenses;

(b) misappropriated the money; and

(c) prepared improper tax returns.

The defendant, Mr. Hunt, is liable to the plaintiffs who are entitled to the return of their $50,000.

3. The preparation of the improper and illegal tax returns was a direct and proximate cause of substantial expenses and costs incurred by the Williams in the sum of $37,300.

4. Defendant Hunt's conduct toward the Williams was intentional, willful, and egregious therefore the plaintiffs are entitled to punitive damages in the amount of $50,000.

5. Clara Neeley is not liable to the plaintiffs under either contract or fraud theories.

Judgment shall be entered for plaintiffs in the amount of $137,300.