Rebecca A. STOECKEL, Plaintiff,

v.

ENVIRONMENTAL MANAGEMENT
SYSTEMS, INC., et al.,
Defendants.

Civ. A. No. 92–1814 (JHG).

United States District Court,
District of Columbia.

April 25, 1995.

Quentin R. Corrie, Scott Snyder, Anderson & Corrie, Fairfax, VA, Paul C. Miller, Daniel L. Hawes, Annette K. Rubin, Fairfax, VA, for Rebecca A. Stoeckel.

Jeffrey E. Nimz, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, Jon M. Kaufman, New York City, for Environmental

Systems, Inc., Environmental Management Consultants, Inc., William F. Heineman.

Powell David Gavin, Rockville, MD, for Clayton E. Miller.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Plaintiff Rebecca A. Stoeckel ("Stoeckel") brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., alleging discrimination on the basis of sex and retaliation for making a complaint of sexual harassment.[1] A three-day bench trial commenced in late 1994. Following the trial, the parties submitted proposed findings of fact and conclusions of law. Upon consideration of the record and evidence presented at the bench trial, including the testimony of witnesses whose credibility, demeanor, and behavior the Court has had a full opportunity to observe and evaluate, judgment is entered against plaintiff and in favor of defendants.

### I. Findings of Fact

Rebecca Stoeckel was hired by defendant Environmental Management Systems ("EMS"), an environmental services firm, in April 1989. EMS is a wholly-owned subsidiary of defendant Environmental Management Consultants, Inc. ("EMC"), an architectural consulting firm. Plaintiffs have alleged, and defendants have not challenged, that at all times relevant to this dispute, EMS and EMC had in excess of 20 employees.

Stoeckel was hired to fill an office administrator position, a revamped version of a previously-existing position at EMS. Her precise responsibilities are a matter of some dispute. According to plaintiff, her responsibilities included invoicing, project tracking, accounting, and office management. According to defendants, Stoeckel's responsibilities covered numerous management and administrative functions. Stoeckel was to be the point contact person for EMS. She was to create and manage EMS's contract files. Most importantly, Stoeckel was to implement a job tracking system by which EMS could monitor its progress on contracts.

The extent to which "job tracking" was a part of Stoeckel's job, and the precise nature of the "job tracking" Stoeckel was to perform, were vigorously disputed by the parties over the course of the trial. In plaintiff's view, the job tracking she was hired to perform was for billing purposes and consisted of posting the number of hours worked, samples taken, and expenditures made, by project and by employee. Stoeckel testified that she was required to provide, and did provide, these tracking reports to William Heineman ("Heineman"), President of EMC, and others on a regular basis. She further testified that her supervisor, David Custer ("Custer"), President of EMS, trained her how to do the reports, and never informed her that the reports were for other than billing purposes.

The job tracking system as envisioned by defendants was different from and more complex than the system described by Stoeckel. As described by Heineman, job tracking was a system by which Stoeckel was to break out the various components of EMS's contracts, such as labor, samples, and expenses, and set milestones for the performance of the contracts. Ms. Stoeckel was to obtain information on hours and costs from employees, determine whether projects were proceeding within their cost and time constraints, and submit written reports periodically to Heineman and others. The purpose of the program was to provide an early warning system to avoid cost overruns and other problems that EMS had experienced on a number of its contracts.

Heineman testified that he explained the tracking responsibilities to Stoeckel at her initial job interview. He contended that he questioned Stoeckel and Custer at numerous staff meetings about the lack of tracking reports; this testimony was confirmed by the testimony of Clayton Miller and Beth Hudson.

Stoeckel denied that she was questioned about the reports at staff meetings and indeed denied that a job tracking system such

1. Two defendants and one claim were dropped from plaintiff's complaint, either by consent or pursuant to Order of this Court.

as that described by Heineman was ever a part of her job description. Stoeckel's testimony was corroborated by Custer, her immediate supervisor. He testified that job tracking for cost control purposes was not among plaintiff's responsibilities. Custer further stated at trial that a job tracking system for cost control purposes had never existed at EMS, nor had he been requested to develop one. Stoeckel's and Custer's testimony concerning the job tracking system conflicts directly with the testimony of Heineman, Clayton Miller, and Beth Hudson, each of whom testified about the importance to EMC and its divisions of job tracking as a cost control mechanism.

The nature of the job tracking function and the extent to which Stoeckel was performing this function is highly relevant to defendants' position in this case. Stoeckel alleges, *inter alia*, that her employment with EMS was terminated in retaliation for her having brought a complaint of sexual harassment against Clayton Miller. Defendants argue that Stoeckel was fired for poor job performance, including her failure to perform the job tracking functions and to provide the required reports. Plaintiff insists that these proffered reasons for her termination are pretextual.

There is no doubt that top management officials at EMC and EMS had very different views concerning the nature and purpose of the job tracking function. It is also evident that Stoeckel was never directed by David Custer, her immediate supervisor, to perform the tracking function in the manner described by Heineman and others. The Court finds that until December 18, 1989, Stoeckel was performing the job tracking function as requested and directed by her immediate supervisor, then-president David Custer.

Beginning in June 1989, Clayton Miller ("Miller"), another EMS employee, began to make comments to Stoeckel about her physical appearance and other comments of a sexual nature. Miller also initiated physical contact with plaintiff on a number of occasions. At the time, Miller was a vice president of EMS. He had no supervisory responsibilities over Stoeckel, although they frequently exchanged information and interacted on the job.

Stoeckel testified that Miller was "kind of flirtatious from the start" of her employment with EMS. He would compliment her with comments such as "you look very good in high heels." He made frequent remarks to her about his dating activities. He frequently winked at her while in close proximity. Another time, Miller touched Stoeckel's blouse to straighten her collar.

At least once, Miller approached Stoeckel while she was seated at her computer work station and rubbed her shoulders and neck. Stoeckel testified that Miller rubbed her neck and shoulders on numerous occasions; Miller testified that he recalled rubbing Stoeckel's neck once, and that Stoeckel thanked him. Miller also testified that Stoeckel reciprocated by rubbing his neck. While unclear as to the time frame within which the alleged reciprocation took place, Miller testified that it was not immediate. The Court is persuaded that on at least one occasion, Miller rubbed Stoeckel's neck and shoulders but does not credit Miller's statement that Stoeckel reciprocated.

Stoeckel also testified that Miller took her by the hand and led her around the office, although she did not specify how often this occurred. The only specific incident relayed by plaintiff was that on one occasion, Miller led her by the hand to observe another employee sleeping at the employee's desk.

Miller agreed that on one occasion he did take Stoeckel's hand and lead her around the office, but he testified that the act represented more of a gesture of unity by a new management team (*see* discussion of change in management at EMS, *infra*), and not a sexual advance of any type. Other witnesses testified that they never observed Miller leading Stoeckel by the hand. This testimony is not particularly probative, however, since it is quite possible that other employees would not have observed a brief hand-holding incident.

Ms. Stoeckel further testified that Mr. Miller frequently followed her around the office. On one occasion she asserted he followed her onto an elevator and made an improper ad-

vance. Stoeckel testified that Miller stood in front of her and placed his hands on either side of her head. She thought Miller was about to kiss her. Miller categorically denies the elevator incident, stating that as a non-smoker, he had no interest in being in such close proximity to Stoeckel, who smokes. Plaintiff's testimony regarding the elevator incident was more persuasive than Miller's, and is credited.

Stoeckel never told Miller to stop making comments or to stop touching her; rather, she would move out of the way or leave the area and avoid Miller whenever possible. Stoeckel testified, and the Court accepts, that Miller's comments and behavior made her reluctant to be in the same area as Miller without other people in the vicinity and that she was very conscious of his whereabouts. Nonetheless, during the four months these incidents occurred, Ms. Stoeckel not only did not tell Miller to cease his actions; she did not tell anyone else nor, as best as can be known, did anyone else observe Miller's actions or know of Ms. Stoeckel's desire to be left alone.

It was only in September, within a week of the elevator incident, that Stoeckel finally complained to her supervisor, David Custer, about Miller's behavior. Custer was angered and said he would "take care of it." Later that day, Custer spoke to Miller about Stoeckel's allegations and told him to stop harassing Stoeckel.[2] Miller indicated surprise at the allegations but told Custer that he wanted to apologize to Stoeckel. Custer recommended that Miller not apologize; however, within the next day or so Miller approached Stoeckel and told her that "he was sorry for whatever he did that offended her". Stoeckel was caught off guard by Miller's comment, and responded by saying "OK".

Custer testified that in addition to talking with Miller, he reported Stoeckel's complaint to Heineman and that Heineman approved of Custer's handling of the complaint. Heine-

man emphatically denied that Custer informed him of Stoeckel's complaint, asserting that he first learned of the allegations when he received a copy of Stoeckel's EEOC complaint. This fact is significant because it bears on whether in terminating Stoeckel's employment, Heineman was acting with knowledge of Stoeckel's complaint against Miller. Having observed the testimony and demeanor of all witnesses, the Court fully credits Heineman's testimony that he was unaware of Stoeckel's complaint until he received a copy of her complaint to the EEOC.

Defendants have urged the Court to find that EMS and EMC had procedures for handling complaints of sexual harassment and that these procedures were not followed by Stoeckel. The Court cannot so find. The only policy submitted as evidence was a handout given to new employees.[3] The relevant paragraph of the handout states:

*IF YOU HAVE A PROBLEM*

Problems should be settled as quickly as possible ... There are times when work related problems will arise, even though we try to prevent them. When this happens, we urge you to discuss them with your supervisor, who in most cases can assist in resolving them. If, in your opinion, this is not practical, you should feel free to consult with your Division Chief, or any other company officer with whom you feel comfortable."

This handout falls short of what the Court would consider to be a *policy* on sexual harassment, in that neither sexual harassment specifically nor discrimination complaints generally are mentioned in the handout. In any event, Stoeckel followed the procedures contained in the handout, in that she complained (although not "quickly", as the handout suggests) to her supervisor, David Custer, about her concerns.

After Miller apologized to Stoeckel, Stoeckel testified that her working relation-

---

2. Custer testified that Miller initially denied the allegations, but several hours later telephoned Custer to admit that he had engaged in the conduct in question. The Court finds the issue of whether Miller initially denied the allegations immaterial.

3. James Martinelli, vice-president of EMC, testified that EMC had a written equal employment opportunity/affirmative action policy, but no such policy was ever offered at trial.

ship with him became strained: Miller would avoid her and refused to sit next to her at meetings, commenting that he might get in trouble for doing so. Stoeckel testified that Miller eventually resumed making comments about Stoeckel's appearance, but there were no further incidents of physical contact. She made no further complaints about Miller's conduct. Stoeckel also testified that following her complaint to Custer, her relationship with Heineman became more strained and less friendly.

Other than recounted herein, Miller did not specifically contradict Stoeckel's testimony, although he stated that after he apologized to her, he monitored his behavior.

The Court credits Stoeckel's testimony that following her complaint, Miller commented on at least one occasion about not sitting next to her at meetings. But her testimony asserting that Miller made further comments about her clothing was too vague and imprecise to be credited. The Court finds that following Stoeckel's complaint to Custer, Miller ceased the objectionable conduct.

Stoeckel testified that Heineman was critical of several ideas she presented but was not critical of the same ideas when they were presented by male employees, specifically Custer. In Stoeckel's view, Heineman's criticism constituted gender bias and contributed to a hostile work environment. Stoeckel also testified that during her tenure with EMS, she was directed to hire a new receptionist for EMC. She testified that Heineman directed her to hire a female for the position, stating that answering telephones was not a "man's job".

Stoeckel further testified that Heineman was very critical at meetings of ideas from other female employees of EMC and its divisions. Yet several female employees, including Beth Hudson, president of another of EMC's divisions, related persuasively that Heineman was not especially critical of ideas

from women and that they did not perceive a hostile work environment at EMC.

In mid-December 1989, Custer submitted his resignation to Heineman. The testimony regarding subsequent events is conflicting. According to Stoeckel, Heineman convened a general staff meeting to announce the resignation shortly after Custer submitted it. At that meeting, Heineman announced that Miller would likely succeed Custer as president of EMS.

In contrast, according to Heineman, Miller, and James Martinelli ("Martinelli"), the meeting was smaller and included only Heineman, Stoeckel, Miller, and Martinelli.[4] According to the defendants' witnesses, at the meeting Heineman questioned Stoeckel about her loyalty to EMS and whether she planned to remain at the company or leave with Custer. Stoeckel's job performance was then discussed, with Heineman expressing displeasure over not receiving the job tracking reports and insisting that these reports be provided in the future.

These witnesses further related that Stoeckel firmly declared her intention and desire to remain at EMS. Heineman testified that Stoeckel requested the job tracking reports be suspended for two weeks so that she could focus on other aspects of her job.

According to Heineman and Miller, the December 18, 1989 meeting wiped the slate clean of any prior dissatisfaction with Stoeckel's job performance. They both believed they were off to a fresh start with their new management team. Stoeckel categorically denies that the December 18 meeting took place as Heineman and Miller described it.

Miller took over as president of EMS upon Custer's departure in early January, 1990. According to Heineman, Martinelli, and Miller, another meeting with Stoeckel was held on January 8, 1990, shortly after Custer left EMS. At the January 8th meeting, Stoeckel's job performance was discussed, including her continued failure to provide the job tracking reports as requested by Heineman.[5]

---

4. Martinelli testified that two meetings took place on December 18, 1989: a general staff meeting to announce Custer's resignation, and a smaller meeting to discuss Stoeckel's future with EMS.

5. The Court notes that Heineman had agreed to suspend the reports for two weeks following the December 18, 1989 meeting.

Heineman expressed dissatisfaction with Stoeckel's performance and informed her that as of that date, she was on probation with EMS. According to Heineman, Martinelli, and Miller, during this discussion criticizing her work performance, Stoeckel asked to be promoted to Vice President of EMS, a request which Heineman emphatically rejected.

Heineman, Martinelli, and Miller recounted that Stoeckel's job performance plummeted after the January 8, 1990 meeting. It was their testimony that she spent an excessive amount of time on personal telephone calls, her work hours became erratic, and she spent a significant portion of her office time on her husband's business. Heineman credibly testified that he frequently approached Stoeckel's desk and found her on personal telephone calls, and Stoeckel would not follow up with him once she was off the telephone.

Stoeckel does not deny that an exchange similar to the January 8 meeting described by Heineman, Martinelli, and Miller took place; however, she places the date of that exchange as January 18, 1990. According to Stoeckel's account, on January 18, she was called into a meeting with Heineman, Miller, and Martinelli. At the meeting she was asked about her loyalty to EMS and her future with the company, and she was challenged about the job tracking reports. In response, Stoeckel argued that she was satisfactorily performing her job. During the course of the meeting, Stoeckel expressed interest in advancing to the position of Vice President of EMS, and was told that her request was out of the question. In addition, Heineman told her she was overpaid and that she was back on probation with EMS.

It is Ms. Stoeckel's contention that the January 18 meeting marked the first occasion on which her job performance was questioned. Stoeckel viewed the meeting as a "test" of whether she would be willing and able to stay on with EMS. She believed that if she still had her job by the end of the meeting, she would remain employed with EMS.

Heineman and Miller confirmed that a meeting took place on January 18, 1990, but here again, their testimony differs substantially from Stoeckel's.[6] Mr. Heineman stated that prior to the meeting, he asked Miller how things were going with Stoeckel's job performance, and Miller responded "miserably." Miller told Heineman that Stoeckel was failing to return telephone calls from clients, showed no enthusiasm, and made no effort to do her job.

Heineman testified that at the January 18th meeting, he challenged Stoeckel on her job performance and told her of Miller's comments. Stoeckel denied that she was failing to do the job and accused Miller of lying. The meeting grew heated and both Heineman and Stoeckel were shouting and angry. Stoeckel stormed out of the meeting in a rage. Following the meeting, Heineman saw Miller and told him that as far as he was concerned, the situation with Stoeckel was hopeless and her employment should be terminated. Miller concurred, and Heineman told Miller he would handle the situation from there.[7]

The next day, January 19, was a Friday. Stoeckel telephoned the office and Miller suggested that she take the day off, given the heated nature of the meeting the day before. Stoeckel returned to EMS on Monday, January 22, 1990, and discovered her computer had been locked. Heineman called her into his office and informed her that her employment with EMS was terminated.

The events in question occurred more than five years ago. It is quite understandable

---

**6.** Miller testified at trial that he was not present at the January 18 meeting, although that testimony contradicted his deposition, in which he stated that he *was* present at the meeting. Heineman testified that the January 18 meeting was between Heineman and Stoeckel only.

**7.** Heineman testified that Miller did not explicitly recommend that Stoeckel be fired. Miller's own testimony is contradictory as to whether he rec-

ommended that Heineman fire Stoeckel. At trial, Miller denied that he ever recommended that Stoeckel be fired, but in his deposition, he testified that he recommended that Stoeckel be fired after the meeting in late January. Whether or not Miller explicitly recommended that Stoeckel be fired, it is clear, and the Court so finds, that Miller fully communicated his dissatisfaction with Stoeckel's job performance to Heineman.

that plaintiff and other witnesses offered contrasting versions of the events, given the inevitable fading of memories over time. But it is undisputed that at least two meetings took place between Stoeckel and Heineman—one shortly after Custer submitted his resignation and one in mid-January. What is disputed is whether a third meeting took place in early January, and the extent to which Stoeckel was informed of Miller's and Heineman's dissatisfaction with her job performance prior to the termination of her employment.

The Court finds the testimony of William Heineman the most credible of all witnesses on the chronology and content of the meetings. His recounting of the events, bolstered by his demeanor and the manner in which he testified, was highly persuasive. Accordingly, the Court finds that 1) Mr. Heineman did discuss the importance of the job tracking reports with Stoeckel at the December 18, 1989 meeting; 2) a meeting, in part concerning Stoeckel's job performance, occurred in early January at which time Heineman reiterated the importance of the job tracking reports; 3) Stoeckel's job performance continued to be unsatisfactory to Heineman following the January 8th meeting; 4) Heineman and Stoeckel had a heated meeting concerning Stoeckel's job performance on January 18, 1990; and 5) Heineman fired Stoeckel the following Monday.

## II. *Conclusions of Law*

Plaintiff brought this action pursuant to Title VII of the Civil Rights Act of 1964, as amended.[8] Plaintiff's amended complaint raised four counts, including discrimination in employment on the basis of sex, maintenance of a hostile work environment, discriminatory termination of employment on the basis of sex, and retaliation in termination of employment. These claims will be considered in turn.

### A. *Discrimination in Employment*

In Count One of her amended complaint, Stoeckel alleges that defendants "harassed and discriminated against Plaintiff on account of her sex" and "took adverse employ-

ment actions ... affecting the terms, conditions, and privileges of her employment ... because of her status as a female employee."

■ In order to prevail on a claim of disparate treatment, plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Once a *prima facie* case has been established, a presumption of wrongful discrimination arises, *see United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 714, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983), and the burden shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the challenged action. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *see also Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095–96. The burden on the employer is merely one of production, because "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093). If the defendant carries this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093.

Stoeckel's evidence on this count consists of 1) Stoeckel's testimony that Heineman belittled ideas from women, including herself (which Custer corroborated in his testimony); and 2) Stoeckel's testimony that Heineman directed her to hire a female receptionist because of his view that answering telephones was not an appropriate occupation for a man. Both of these assertions were contradicted by the testimony of other witnesses.

---

8. The amended complaint also included one count under the D.C. Human Rights Act, but that

count was dismissed by the Court in December 1993.

▮ The evidence presented by plaintiff, even if accepted as true, is insufficient to make out a *prima facie* case of sex discrimination. Plaintiff has offered no evidence linking Heineman's alleged criticism of her ideas to adverse consequences with respect to her position or pay.[9] Moreover, to the extent Heineman did direct Stoeckel to hire a female applicant instead of a male applicant for the receptionist position, such action does not translate into discrimination against *Stoeckel* giving rise to a disparate treatment claim. Accordingly, count one of plaintiff's amended complaint fails.

## B. *Hostile Work Environment*

In Count Two of her complaint, Stoeckel alleges that defendants created a hostile work environment in violation of Title VII through, *inter alia,* condescending comments by Heineman and unwelcome comments and behavior of a sexual nature by Miller. Stoeckel claims that the conduct unreasonably interfered with her work environment.

▮ In contrast to *quid pro quo* sexual harassment cases, where a benefit or condition of employment is conditioned on acquiescence to the sexual advances of another employee, hostile work environment cases concern "conduct that [is] severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive." *Harris v. Forklift Systems, Inc.,* —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). As the Supreme Court noted in *Harris,* determining whether a hostile work environment exists is not "a mathematically precise test", but rather "can be determined only by looking at all the circumstances", including 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and 4) whether it unrea-

sonably interferes with an employee's work performance. *Id.* —— U.S. at ——, 114 S.Ct. at 371.

▮ Whether Miller's comments and behavior created a discriminatory, hostile work environment in violation of Title VII is a difficult question.[10] As the Supreme Court pointed out in *Harris,* Title VII does not protect against all comments that an employee may find offensive. —— U.S. at ——, 114 S.Ct. at 371. Still, there comes a point where behavior crosses over the line and becomes sufficiently pervasive and severe to create a hostile work environment and constitute sex discrimination.

The acts in question include: Miller's comments about Stoeckel's dress, his rubbing of plaintiff's neck and shoulders on at least one occasion, his touching plaintiff's clothing on one occasion, his winking at plaintiff, his following Stoeckel around the office, the elevator incident, and Miller's comments to plaintiff about his dating life. These actions took place over a four month period of time.

▮ Upon scrutinized evaluation of the testimony, the Court finds that these incidents, taken in the context of all the facts and circumstances presented, do not rise to the level of such pervasiveness and severity to constitute a hostile work environment. The Court has no doubt that Stoeckel found Miller's conduct objectionable; that his comments and behavior were unwelcome to her (even though she never verbally ordered him to stop); and that his conduct caused her discomfort. It is also apparent that Miller's conduct was highly unprofessional and inappropriate, particularly considering his position within EMS.

At the same time, Ms. Stoeckel did not testify that she found any of the incidents, save the elevator incident, physically threatening in any way.[11] Moreover, Stoeckel nev-

---

**9.** To the contrary, as of December 18, 1989, Ms. Stoeckel was considered part of the new management team. *See supra* at 11.

**10.** Also included in Stoeckel's hostile work environment claim are Heineman's alleged acts of belittling ideas from female employees. The Court credits Hudson's testimony that she did not believe Heineman belittled her ideas. To the

extent Stoeckel believed that Heineman belittled her (Stoeckel's) ideas, the Court does not view this as a significant element in plaintiff's hostile work environment claim.

**11.** Stoeckel did not testify that she believed she was in any physical danger in the elevator, but she testified that she thought Miller was going to

er complained to anyone about Miller's actions until four months after they commenced.[12] Corrective action was immediately taken by Stoeckel's supervisor, an apology ensued, and the unwanted behavior ceased.

■ The test of whether a hostile work environment exists is not whether offender's conduct is objectionable, unprofessional, or uncalled for; nor does the test focus solely on how the recipient of the comments and behavior construes the actions. Rather, the test is whether the conduct is "*severe* or *pervasive* enough to create an *objectively* hostile or abusive work environment." *Harris,* —— U.S. at ——, 114 S.Ct. at 370 (emphasis added). While Miller's conduct comes close to the line, the Court cannot find it was sufficiently egregious to rise to the level of a violation of Title VII.[13] Accordingly, the defendants prevail on Count Two of plaintiff's complaint.[14]

## C. *Discriminatory Termination*

■ In Count Three of her amended complaint, plaintiff alleges that defendants "discharged and terminated Plaintiff's employment on account of her sex and for reasons arising from discrimination and harassment of Plaintiff on account of her sex." At trial, plaintiff testified that her sex was a "partial factor" in her discharge, and refer-

kiss her and, understandably, found that objectionable.

12. The Court views this fact as an indicator of the degree to which Miller's behavior pervaded Stoeckel's work environment. It is readily apparent to the Court that Stoeckel and Custer, her immediate supervisor, enjoyed a close and comfortable working relationship. Ms. Stoeckel repeatedly referred to Custer as "David" during her testimony, and both Stoeckel and Custer testified about their positive working relationship. The fact that Stoeckel elected not to mention Miller's behavior to her ally Custer, who, as President of EMS, was clearly in a position to address the problem, is a relevant factor in considering the impact of Miller's actions on Stoeckel.

13. The Court notes that cases in which other courts have found conduct to constitute hostile work environment discrimination typically involve explicit sexual advances toward the recipient, sexual innuendo, sexual comments or derogatory comments to the recipient in the presence of other employees, comments or actions of a lewd or tasteless nature, and similarly severe

enced Heineman's alleged hostility to her ideas as evidence. In order to establish a *prima facie* case of disparate treatment discrimination, Stoeckel must demonstrate sufficient facts to create an inference of unlawful discrimination. *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). The Court finds that the evidence presented on this claim falls short of establishing a *prima facie* case that plaintiff was terminated because of her sex; accordingly, plaintiff cannot prevail on this count.

## D. *Retaliatory Discharge*

Plaintiff's final count alleges that defendants "retaliated against Plaintiff because of her opposition to, and having complained about, Miller's sexually-motivated misconduct towards her", and that defendants "terminated Plaintiff's employment as a part of this retaliation."

■ In order to prevail in her claim that she was terminated in retaliation for opposing Miller's conduct, Stoeckel must present evidence sufficient to establish a *prima facie* case raising an inference of retaliatory discharge. Our Court of Appeals has stated plaintiff's initial burden of proof as follows:

behavior. *See, e.g., Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (frequent sexual innuendo and derogatory comments of a sexual nature, often in front of other employees); *Katz v. Dole,* 709 F.2d 251, 254 (4th Cir.1983) (plaintiff subjected to "extremely vulgar and offensive sexually related epithets"); *Bundy v. Jackson,* 641 F.2d 934, 940 (D.C.Cir.1981) (plaintiff subjected to frequent sexual advances by her supervisor); *see also Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 528–29 (7th Cir.1993) (sexual advances, including physical contact by the offender, not sufficient to establish hostile work environment). The actions in question in this case, while understandably unwelcome, do not rise to the same level of severity.

14. The Court notes that even if it had found that a hostile work environment existed at EMS and that EMS and EMC were liable for Miller's actions in creating a hostile work environment, plaintiff failed to demonstrate what, if any, relief she was entitled to in connection with this count.

**1116**

In order to establish a prima facie case of retaliation, a plaintiff must show: 1) that she engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two. As in a case of disparate treatment, this initial burden is not great. Plaintiff merely needs to establish facts adequate to permit an inference of retaliatory motive. *Mitchell v. Baldrige,* 759 F.2d 80, 86 (D.C.Cir.1985) (quoting *McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984)). Once plaintiff has established a *prima facie* case, the burden of proof shifts to the employer to articulate a non-discriminatory reason for its actions; plaintiff then has an opportunity to show that the employer's reasons are pretextual. *Id.*

■■■■ Plaintiff has established a *prima facie* case of retaliatory discharge in that 1) she complained to Custer that she was being sexually harassed by Miller; 2) Miller was made aware of the complaint; and 3) she was terminated two weeks after Miller replaced Custer as President of EMS. Defendants have rebutted Stoeckel's *prima facie* case through testimony that Stoeckel was fired for poor performance, not in retaliation for having made a complaint of sexual harassment against Miller. Thus, the question turns on whether defendants' proffered explanation is merely a pretext for unlawful discrimination.

■■■ Plaintiff's testimony raises questions about the extent to which Stoeckel was on notice that Heineman and Miller were dissatisfied with her job performance. It is undisputed that as of December 18, despite prior concerns about her job performance, Heineman and Miller viewed Stoeckel's record as a "clean slate". However, the Court finds credible and persuasive Heineman's testimony that despite confrontations with him on at least two occasions (December 18 and January 8) about the job tracking reports and other aspects of her job, Stoeckel's job performance from January 8—January 18, 1990

was unsatisfactory, both in terms of her failure to provide the job tracking reports and her overall (and rapidly deteriorating) work habits. Stoeckel's rebuttal consisted solely of her testimony denying that she was warned of poor job performance at any time prior to January 18, 1990. Given the Court's findings of fact about the several meetings concerning, *inter alia,* Stoeckel's job performance, Stoeckel's rebuttal is unpersuasive and therefore insufficient to meet her burden of proving that defendants' reason for firing her was a pretext for discrimination.[15] Consequently, plaintiff cannot prevail on Count Four of her amended complaint.

Based upon the findings of fact and conclusions of law recited above, it is

ORDERED that judgment shall be entered, in accordance with the judgment page attached hereto, against plaintiff, Rebecca Stoeckel, and in favor of defendants EMC and EMS.

IT IS SO ORDERED.

---

15. Plaintiff did not offer testimony to rebut Heineman's allegations of poor job performance between January 8—January 18, 1990, including, *inter alia,* his allegations that Stoeckel spent an excessive amount of time handling personal business on the telephone, her work hours became erratic, and that she failed to terminate her personal business to communicate with her employer when he awaited her attention.