**DAKA, INC., Appellant,**

v.

**James W. BREINER, Appellee.**

No. 95–CV–441.

District of Columbia Court of Appeals.

Argued April 24, 1996.

Decided April 30, 1998.

Keith A. Dorman, Chicago, IL, with whom John J. Vecchione, Washington, DC and Neil G. Wolf, Chicago, IL, were on the brief, for appellant.

Gary T. Brown, Washington, DC, for appellee.

Before TERRY, STEADMAN, and REID, Associate Judges.

TERRY, Associate Judge:

Daka, Inc., appeals from a judgment of the Superior Court in favor of James Breiner, a former Daka employee. Alleging age discrimination, Breiner filed suit against Daka under the District of Columbia Human Rights Act, D.C.Code §§ 1–2501 *et seq.* (1993) ("DCHRA"). After a five-day trial, the jury found that Breiner had not established a *prima facie* case of wrongful termination, but it returned a verdict in his favor on his age-related hostile environment claim, awarding him $10,000 in compensatory damages and $390,000 in punitive damages. Daka then filed a motion for judgment notwithstanding the verdict or, in the alterna-

tive, for remittitur. The trial court denied the motion, and Daka noted this appeal.[1] Before us Daka argues that the evidence was insufficient to support Breiner's hostile environment claim, that punitive damages should not have been awarded either as a matter of law or as a matter of fact, and that even if punitive damages were allowable, the court abused its discretion by denying the request for a remittitur. We are not persuaded by any of these arguments, and accordingly we affirm the judgment.

## I. FACTUAL BACKGROUND

At all times pertinent to this case, Daka was a contract food service provider[2] for the Smithsonian Institution at its Museum of Natural History ("MNH"), Museum of American History ("MAH"), and National Portrait Gallery ("NPG"). In July 1987 Daka hired Louis Sakell to be the general manager of its Smithsonian account. His primary responsibility was to oversee food services for the three buildings and to ensure compliance by Daka with its food service contract. Because this was Daka's biggest account,[3] Sakell installed an additional tier of managers, to be known as building directors (one for each building), to supervise the operations in the three museums. In addition to overseeing branch managers, each building director's responsibilities included staffing, sanitation, profitability, the quality of food service, and payroll and cash management.

In April 1990 Sakell hired James Breiner, who was then fifty-four years old, as building director of MNH.[4] After the building director of MAH was reassigned to another city, Breiner was transferred, at Sakell's request, to that position in October 1990. Because the food service responsibilities at MAH

---

1. Breiner moved for leave to note an untimely cross-appeal on his wrongful termination claim. Finding no excusable neglect under D.C. Ct.App. Rule 4(a)(4), the trial court denied his motion. This court *sua sponte* summarily affirmed that denial in an unpublished order. *Breiner v. Daka, Inc.*, No. 95–CV–1391 (D.C. October 18, 1995).

2. The name "Daka" is an acronym for Dining and Kitchen Administration.

3. Mr. Sakell testified that Daka had an "annual income" of approximately $8.5 million from its three Smithsonian facilities.

4. Sakell and Breiner had previously worked together for the Marriott Corporation, where Breiner had spent thirty years in its food service division. Sakell initially offered Breiner a job as a branch manager with Daka. After Breiner declined that offer, Sakell contacted him again and offered him the higher-level position of building director, which he accepted.

were greater than those at MNH, Breiner received a raise in salary at that time. Daka fired Breiner little more than a year later, in November 1991, citing a precipitous decline in performance after his transfer to MAH. Thereafter Breiner filed this suit against Daka, seeking damages for age discrimination and intentional infliction of emotional distress.

At trial several former Daka employees testified on behalf of Breiner. Thomas Neff, a branch manager at MNH, was employed by Daka from January 1991 to July 1992. Although Neff worked in MNH and Breiner worked in MAH, two blocks away, the two men had frequent contact with each other from January to November 1991 during Daka's weekly managerial meetings and, on occasion, when Breiner and others would get together in the MNH cafeteria. During these formal and informal meetings, Neff repeatedly heard Sakell make negative, age-related comments about Breiner.[5] According to Neff, Sakell described Breiner as "over the hill," referred to him as an "old fogey," and said that he could not "get it up any more." At the regular weekly meetings, Sakell would address Breiner in front of the other managers as the "senior citizen," the "older guy," or the "old fogey." Although Sakell laughed at these remarks, no one else did. Breiner in particular did not laugh; according to Neff, "his face looked like a man who had to endure these insults because he wanted to keep his job." Neff also testified that Sakell, not Breiner, initiated these comments.

Neff's testimony was corroborated by two other branch managers, Jeffrey Gelfand and Alan Eaton. Gelfand, who worked for Daka from April 1991 to April 1992, said that it was not uncommon for Sakell to refer to Breiner as an "old man" or "old fart." Eaton, who was in charge of the MAH staff cafeteria from January 1991 to June 1992, recalled one occasion when Sakell said to

him, as Breiner approached, "Get the wheelchair out, here comes the old boy now." According to Eaton, Breiner was also the target of similar comments made by other branch managers.

Breiner testified that his problems with Sakell began as early as the first job interview, when Sakell remarked to Breiner that finding a job at his age "must be tough." About a month later, Sakell began to call Breiner an "old man" and insinuated that Breiner did not have the stamina at his age to walk to the other Smithsonian buildings. At the weekly managerial meetings, Sakell made remarks such as "Let's have an opinion from the old man here," "What's your plan, old-timer?", or "Old man, old man, this gray-haired man to my left, he's as old as my father, you know...." Breiner denied initiating these comments, but admitted that he occasionally participated in them by referring to himself as an "old timer" who was from the "old school."

As time went on, Sakell's insults became more frequent and more caustic.[6] Sometimes Sakell would "sort of" laugh when making these remarks, but at other times he would not. Breiner "didn't consider [the comments] to be a joke," nor did he laugh; instead, he "sometimes just stared back at [Sakell] because he had said these things." At least once, Sakell called Breiner an "old fuck," and on another occasion he asked Breiner, "You're not getting senile on me, are you?" Breiner became upset during this latter incident and told Sakell that he did not "appreciate that remark." Sakell's conduct persisted nevertheless. For example, on several occasions Sakell would criticize Breiner's food selection at lunch by saying such things as "Is that what I've got to look forward to when I get to be your age and eat salads just like that?"

Sakell was not the only Daka employee who insulted Breiner with age-related comments. Meg McKenna, a branch manager at

---

**5.** Neff testified that in the cafeteria he heard Sakell make such comments on five separate occasions. He also recalled five other instances in which Sakell made similar remarks during the weekly managerial meetings.

**6.** Breiner also testified that he was not the only Daka employee who was subjected to age-related comments. At one point, for example, Sakell approached Breiner and told him to fire a subordinate manager, Gail Pohlmann, "[b]ecause she's slowing down and look at her, look at the way she walks ... look how slow she is."

MAH subordinate to Breiner, had known him from his days at Marriott and had always referred to him as "Mr. Breiner." However, after a short while at Daka, she began to address him as "old man." Greg Reeves, also a subordinate manager, called Breiner "old man." Once when the two of them were serving a group of young female students in the public cafeteria, Reeves said to Breiner, "What are you looking at those girls for? You can't do anything with them, you can't even get it up any more." Breiner told Reeves that he "ought to cool that kind of talk" and that he was not "supposed to use that kind of language." In response, Reeves turned to another manager named Curry, who was standing nearby, and said, "The old man is criticizing me for talking and calling him an old man. Can you imagine that, Curry?"

Reeves' belligerent attitude toward Breiner continued even in Sakell's presence. On one occasion Reeves, in front of Sakell and a group of customers which included a number of high school students, said aloud, "Hey, Jim, look at that girl there. Can't do nothing with that one, could you?" Breiner rebuked Reeves for using inappropriate language in front of customers, but Reeves turned to Sakell and said, "Lou, would you get this old fart out of my hair?" Breiner asked Sakell to admonish Reeves for his insubordination, but Sakell said, "Oh, you know Greg, he's a pistol. He says that stuff all the time." Breiner responded, "I don't really appreciate that. I don't feel like I'm old. What's he calling me that for?"

Eventually, the persistent insults about his age "started to bother," "irritate," and "really hurt" Breiner. He felt inadequate and wondered whether his job skills had eroded to the point that he was getting too old to do his job properly. He testified:

[I]t hurt me deeply because it had me thinking about myself much more, you know, was I really coming to the end of the road of employment, of working? [The comments] pictured me as being old all the time. . . . It just started to prey on my mind about maybe I'm getting old, and maybe I can't do anything any more.

Breiner's wife testified that, in the weeks before he was fired, her husband became moodier and his eating habits changed. He became obsessed with youthfulness, staying active, and losing weight. He gave up red meat and fattening foods and asked his wife if she thought he was getting old. In addition, he began to suffer from physical ailments, such as a persistent sore throat and prolonged episodes of strained breathing.

Because Daka did not have a formal grievance procedure, Breiner complained directly to Sakell on three separate occasions. He told Sakell that his comments were "against the law" and "illegal" and that he "should know better than that." Despite these complaints, the frequency and severity of the age-related remarks increased to such an extent that Breiner began to record most of them on a piece of paper which he kept in his shirt pocket.[7]

In defense of its actions, Daka asserted that Breiner was fired because of his poor job performance. During the nineteen months that Breiner worked for Daka, his superiors began to have doubts about his managerial ability. Sakell wrote a memorandum to Breiner, which was introduced in evidence, about his failure to dispose of trash at MAH properly.[8] Sakell was also upset that one of Breiner's subordinate managers, Michael Dixon, had been submitting false time records and obtaining paychecks for two "ghost employees" who no longer worked for Daka, and that Breiner had not discovered

7. On cross-examination Breiner admitted that the remarks he wrote down, though age-related, did not reflect on the quality of his work.

8. Breiner received several complaints from Sakell and from Smithsonian supervisors that the dumpster outside MAH leaked and exuded a bad odor. The matter was often raised during managerial meetings. Both Gelfand and Eaton testified, however, that Breiner addressed this prob-

lem immediately by arranging for more frequent trash pickups during the summer and by having the dumpster periodically scrubbed by Daka employees. According to Eaton, the odor did not go away after Breiner was fired, but Smithsonian employees said that trash management under Breiner was much worse than under previous managers.

Dixon's fraud for almost three months.[9] Additional concerns were expressed by Sakell and others about Breiner's apparent inability to manage subordinates and to ensure quality food service.[10]

With respect to the age-related comments directed at Breiner, Daka conceded that such remarks were made, but took the position that it was Breiner who initiated them, and that other employees merely responded in a friendly and joking manner. Mr. Sakell testified that after four or five weeks with Daka, Breiner became more comfortable with his colleagues and began to refer to himself as an "old man" or "old fart." Sakell denied making most of the comments attributed to him by Breiner[11] and denied criticizing Breiner's performance on the basis of his age. However, Sakell admitted using such terms as "old fart" and "old timer," but only after Breiner himself had used them in conversation. Any references to Breiner's age were uttered purely in jest and were not inappropriate, in Sakell's opinion, in the context of Daka's informal work environment.

Pamela Leyseth, a branch manager at MNH during Breiner's tenure at Daka, similarly testified that several managers made comments about Breiner's age during company meetings, but that Breiner had initiated them by saying he was from the "old school." Leyseth characterized these comments as made in a "joking" manner and that Breiner had responded "jokingly." Leyseth herself, however, neither joined in them nor laughed at them because she did not think they were funny.

After hearing all the evidence, the jury returned a verdict for Daka on Breiner's claim of wrongful termination. The jury also found, however, that an age-related hostile work environment existed at Daka and found Daka liable for compensatory damages for emotional distress in the amount of $10,000. In addition, the jury awarded $390,000 in punitive damages, based on its finding (recorded on the verdict form) that Louis Sakell and his co-workers had "acted with evil intent or actual malice when they created a hostile work environment."[12]

9. Sakell discovered in May 1991 that Breiner, who was responsible for monitoring the staff and payroll functions at MAH, had failed to detect Dixon's criminal scheme, even though "it was his job to audit these things and it was right under his nose." Dixon pocketed between $3500 and $3800 before his fraud was discovered. Sakell reprimanded Breiner both orally and in writing for this "major screwup" and seriously considered firing him at that time.

10. Breiner was again reprimanded when he failed to make facility improvements that Sakell had recommended. In October 1991 Sakell conducted a walk-through inspection of the ice cream parlor at MAH and noticed several deficiencies. He told Breiner to fix these problems, but a reinspection in November revealed that they had not been corrected. Shortly thereafter, Sakell sent a memorandum to Breiner detailing Breiner's failure to do what needed to be done. Nevertheless, Sakell gave Breiner a rating between "competent" and "high competent" on his performance evaluation in October 1991. In that evaluation, Sakell recommended that Breiner improve safety precautions, pay more attention to evaluating his staff, and instill greater loyalty in his subordinates. Breiner also received a raise and a $5000 bonus in October—just a month before he was fired.

11. For example, Sakell testified that during his second job interview with Breiner, it was Breiner who initially referred to his age by saying, "I'm

an old man now, you know; it's hard to get back into business." In response, Sakell said he understood because his father had had similar problems. Regarding the confrontation with Greg Reeves, Sakell did not recall hearing Reeves say anything about Breiner's inability to "get it up." Instead, Sakell remembered that Reeves and Breiner "joked quite a bit back and forth" about Breiner's age and Reeves' youthful inexperience.

12. On the subject of punitive damages, the judge instructed the jury as follows:

If you find defendant intentionally discriminated against plaintiff, the law allows you, but does not require you, to award punitive damages. You may consider an award of punitive damages under each claim.

The purpose of an award of punitive damages is, first, to punish a wrongdoer for misconduct, and second, to warn others against doing the same.

In this case you may award punitive damages if you find that defendant engaged in a discriminatory practice or practices with malice or reckless indifference to the rights of plaintiff to be free from such intentional discrimination in employment.

If you determine that the defendant's conduct justifies an award of punitive damages, you may award an amount of punitive damages which all jurors agree is proper. In fixing the amount, you should consider the fol-

## II. THE HOSTILE ENVIRONMENT CLAIM

Daka contends first that the trial court erred in denying its motion for judgment n.o.v. on the age-related hostile environment claim because there was insufficient evidence that an abusive atmosphere existed. Specifically, Daka argues that "Breiner was not subjected to unwelcome harassment, that remarks about his age were neither severely nor pervasively abusive, and that these remarks did not alter the conditions of his employment." In our view, this line of argument is based on an overly selective reading of the record. Having reviewed the record as a whole, as we must, we are satisfied that there was sufficient evidence to support the jury's findings.

### A. Age-based hostile environment claims under the DCHRA

The DCHRA provides in part:

It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the ... age ... of any individual:

(1) *By an employer.* To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee....

D.C.Code § 1–2512(a)(1) (1997 Supp.).[13]

 Relying significantly on federal cases interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1994),[14] this court in *Howard University v. Best,* 484 A.2d 958, 981 (D.C.1984), held that "a plaintiff establishes a prima facie case of sexual harassment [under the DCHRA] upon demonstrating that unwelcome verbal and/or physical advances of a sexual nature were directed at him/her in the workplace, resulting in a hostile or abusive working environment." *See also, e.g., Estate of Underwood v. National Credit Union Administration,* 665 A.2d 621, 640 (D.C.1995) (citing *Best*); *Norman v. Gannett Co.,* 852 F.Supp. 46, 49 (D.D.C.1994). We conclude that the same test should apply, *mutatis mutandis,* in any DCHRA case in which a plaintiff alleges unlawful discrimination that takes the form of a hostile or abusive working environment. In other words, applying the *Best* standard more generically, a plaintiff such as Mr. Breiner has a viable hostile environment claim if he can demonstrate (1) that he is a member of a protected class, (2) that he has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment. *Best,* 484 A.2d at 978.[15]

lowing questions: How offensive was the conduct? What amount is needed, considering the defendant's financial condition, to prevent future repetition? Does the amount of punitive damages have a reasonable relationship to the actual damages awarded?

If you do award punitive damages, you should fix the amount using calm discretion and sound reason. You must not be influenced by sympathy for or dislike of any party in the case.

**13.** In the current published version of the District of Columbia Code—the 1997 pocket part to volume 2A of the Code—the caption of paragraph (1) reads *"By an employee."* This is an obvious codifier's error. The DCHRA was originally enacted by the Council of the District of Columbia in 1977. D.C. Act 2–83, 24 D.C. Register 2830, *renumbered as* D.C. Law 2–38, 24 D.C. Register 6038 (1977). Section 211 of the DCHRA was codified as section 1–2512 of the

Code. In the original version of the DCHRA as enacted by the Council, however, the caption of section 211(a)(1) reads *"By an employer."* 24 D.C. Register at 2841. Since the actual language of the original statute as enacted by the Council is controlling, we shall ignore the codifier's error and read the Code provision as conforming to the original.

**14.** This court has "often looked to cases construing Title VII to aid us in construing the D.C. Human Rights Act." *Atlantic Richfield Co. v. District of Columbia Commission on Human Rights,* 515 A.2d 1095, 1103 n. 6 (D.C.1986) (citations omitted).

**15.** In many cases there is a fifth element that must be proved. When an employee sues an employer under the DCHRA for the discriminatory actions of a fellow employee, the plaintiff-employee must also present sufficient proof to

"More than a few isolated incidents must have occurred, and genuinely trivial occurrences will not establish a prima facie case." *Id.* at 980 (citations and footnote omitted). However, "[n]o specific number of incidents, and no specific level of egregiousness" need be proved. *Id.* Whether the plaintiff has met his burden depends on the totality of the circumstances. *Id.* at 980–981. This means that in determining whether the DCHRA has been violated, "the trier of fact should consider ... the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff." *Id.* at 981.

Before applying the *Best* standard to this case, we must address two threshold issues: whether recent Supreme Court decisions modifying the elements of a hostile work environment claim under Title VII should be applied similarly to cases arising under the DCHRA, and whether a hostile environment theory is even appropriate for age-based claims. We shall consider each in turn.

As to the first issue, the parties disagree on whether actual emotional damage must be shown by a plaintiff when proving a hostile work environment claim under the DCHRA. Daka, relying on *Howard University v. Best, supra,* argues that Breiner not only must prove that a reasonable person would have found the work environment hostile and abusive, but also must present objective evidence of actual emotional damage. *See Estate of Underwood, supra,* 665 A.2d at 640. In Daka's opinion, "a requirement of a showing of psychological harm" is particularly important with age-based claims "because age remarks, by their nature, are less invidious than remarks about other protected groups." Breiner maintains, to the contrary, that two post-*Best* decisions of the Supreme Court, *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and *Meritor Savings Bank v. Vinson,* 477 U.S.

57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), have superseded *Best* in this respect.

■■■ *Harris* and *Meritor* hold that a plaintiff in a Title VII action need not prove "a tangible psychological injury" in order to prove the existence of a hostile work environment. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (citing *Meritor,* 477 U.S. at 64, 106 S.Ct. at 2404).[16] The rationale for this holding is that abusive work environments, even those that do not seriously affect an employee's emotional well-being, "can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris,* 510 U.S. at 22, 114 S.Ct. at 371. Thus a plaintiff has an actionable hostile work environment claim under Title VII "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'...." *Id.* at 21, 114 S.Ct. at 370 (quoting *Meritor,* 477 U.S. at 65, 67, 106 S.Ct. at 2405). Under this standard, a plaintiff must demonstrate both an objectively hostile or abusive environment, *i.e.,* one that a reasonable person would find hostile or abusive, and a subjective perception by the plaintiff that the environment is abusive. But the plaintiff need not prove, in addition, that he or she suffered an actual psychological injury.

> Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive ... there is no need for it also to be psychologically injurious.

---

hold the employer liable under the doctrine of *respondeat superior. See Best,* 484 A.2d at 978, 982–983. In this case, however, no contention is made that Mr. Sakell's conduct is not attributable to Daka, nor could Daka make such an argument on this record. Sakell was, after all, Breiner's immediate supervisor, and Breiner's claim is based largely on what Sakell did and failed to do. To the extent that Breiner's case is

based on the actions of other employees (Reeves, for example), his claim against Daka depends on Sakell's failure to intervene when Breiner sought his assistance.

16. A plaintiff must still demonstrate, however, that the conduct on which the claim is based was more than "merely offensive." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370.

*Harris,* 510 U.S. at 22, 114 S.Ct. at 371 (citation omitted).

A quite persuasive argument can be made that *Harris* has put a significant gloss on *Best,* or even that *Harris* has superseded *Best* to the extent that the two cases are inconsistent. We note first that this court, in deciding issues arising under the DCHRA, consistently relies upon decisions of the federal courts in Title VII cases as particularly persuasive authority. *See, e.g., Benefits Communication Corp. v. Klieforth,* 642 A.2d 1299, 1301–1302 (D.C.1994); *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 361 n. 17, 367–368 (D.C.1993); *American University v. District of Columbia Commission on Human Rights,* 598 A.2d 416, 422 (D.C.1991). Even in *Best* itself we applied Title VII principles in resolving the plaintiff's discrimination claim. *See* 484 A.2d at 977–982. Second, the primary purpose of the DCHRA, to eradicate all employment discrimination,[17] would be furthered by our following *Harris* and *Meritor* because the burden upon a plaintiff to establish a *prima facie* case would be a little less heavy than it was under *Best,* in that the plaintiff would no longer have to prove actual psychological injury. *See Harris,* 510 U.S. at 22, 114 S.Ct. at 370. Third, such a holding would be compatible with recent hostile environment cases brought in the District of Columbia under Title VII. *See Park v. Howard University,* 315 U.S.App. D.C. 196, 198, 71 F.3d 904, 906 (1995) (citing *Harris* ), *cert. denied,* — U.S. —, 117 S.Ct. 57, 136 L.Ed.2d 20 (1996); *Gary v. Long,* 313 U.S.App. D.C. 403, 408–409, 59 F.3d 1391, 1396–1397 (1995) (citing *Harris* and *Meritor* ), *cert. denied,* 516 U.S. 1011, 116 S.Ct. 569, 133 L.Ed.2d 493 (1995); *Stoeckel v. Environmental Management Systems, Inc.,* 882 F.Supp. 1106, 1114 (D.D.C. 1995) (citing *Harris* ). Moreover, in the only reported Superior Court decision since *Har-*

*ris,* the court followed *Harris* after assuming that this court "would apply a similar standard and approach to the interpretation of the reach of the [DCHRA]". *Drake v. Henkels & McKoy, Inc.,* 123 Daily Wash. L. Rptr. 2217, 2223 (D.C.Super.Ct.1995).

▮ Having said all this, however, we conclude that we need not decide the point here. We note instead that the trial court's instructions in this case, which were based on *Harris* and not *Best* (and therefore said nothing about actual psychological injury), elicited no complaint from either side. We therefore hold that Daka waived any objection it might have had to any arguable omission from the instructions. *See* Super. Ct. Civ. R. 31 (requiring specific objection to instructions before the jury retires).

Turning to the other preliminary question—whether an age-related hostile environment claim is viable under discrimination statutes such as the DCHRA—we find that only a few courts have considered this issue or anything close to it. Federal courts have done so under the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. §§ 621 *et seq.* (1994), and have unanimously held that hostile work environment claims are equally cognizable in an ADEA case as they are under Title VII. *See, e.g., Sischo–Nownejad v. Merced Community College District,* 934 F.2d 1104, 1109 (9th Cir.1991); *Young v. Will County Dep't of Public Aid,* 882 F.2d 290, 294 (7th Cir.1989); *Eggleston v. South Bend Community School Corp.,* 858 F.Supp. 841, 845–852 (N.D.Ind. 1994); *Spence v. Maryland Casualty Co.,* 803 F.Supp. 649, 671 (W.D.N.Y.1992), *aff'd,* 995 F.2d 1147 (2d Cir.1993); *Drez v. E.R. Squibb & Sons, Inc.,* 674 F.Supp. 1432, 1436–1437 (D.Kan.1987). These courts have concluded that, with no material difference between the ADEA and Title VII,[18] there is no reason to differentiate between age discrimination

---

**17.** *See, e.g., Estate of Underwood, supra,* 665 A.2d at 637 ("[a]ccording to legislative history, enactment of the Human Rights Act underscored the Council's intent that the elimination of discrimination within the District of Columbia should have the highest priority" (citation and internal quotation marks omitted)); *Sutherland, supra,* 631 A.2d at 371–372.

**18.** Title VII of the Civil Rights Act makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2 (a)(1). The ADEA forbids the identical conduct when the discrimination is "because of such individual's age." 29 U.S.C. § 623(a)(1); *see Sischo–Nownejad, supra,* 934 F.2d at 1109.

claimants and members of other protected groups when considering a hostile environment claim. An ADEA plaintiff's rights are simply protected by a different statute, but any claim that those rights have been violated is comparable in substance to a civil rights claim under Title VII. *See, e.g., Drez, supra,* 674 F.Supp. at 1436–1437.

The only state court decision we have found that addresses this issue under a state discrimination statute, *Kelly v. Bally's Grand, Inc.,* 285 N.J.Super. 422, 667 A.2d 355 (1995), reached a similar conclusion by adapting New Jersey's sexual harassment hostile environment analysis "to fit an age animus claim...." *Id.* at 434, 667 A.2d at 362.[19] Thus, under New Jersey's equivalent of the DCHRA, a plaintiff claiming age discrimination "would have to establish that: (1) the complained-of conduct would not have occurred but for her age; (2) the conduct was severe or pervasive; (3) enough to make a reasonable older-aged person ... believe that; (4) the conditions of employment have been altered and the working environment is hostile or abusive." *Id.* (citation omitted).

Like New Jersey's anti-discrimination statute, the DCHRA was enacted to eliminate all discrimination in the workplace, not just sexual or racial discrimination. *See* D.C.Code § 1–2501 (statute is intended to "secure an end in the District of Columbia to discrimination *for any reason*" (emphasis added)). Since the elements of a *prima facie* discrimination claim may be reformulated according to the facts of each particular case, *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973), we see no reason why age-based hostile environment claims should be treated differently from any other harassment claims under the DCHRA.

Daka argues that Breiner's hostile environment claim based on age-related harassment is novel and unprecedented, and should not be considered on the same footing as claims based on racial or sexual harassment because spoken remarks about age are less invidious than racial epithets or sexual slurs. Daka maintains that age-based harassment is less objectionable because "everyone progresses into the protected group"—in other words, we will all grow old sooner or later. On this point, Daka states in its brief:

> Unlike a hostile environment sexual harassment claim that typically involves conduct, photographs, and even sexual advances, Breiner's age-related hostile environment claim is based solely on verbal remarks. In this regard, it is more akin to claims arising from remarks or slurs denigrating a person's race or national origin. But even so, age-related claims still stand apart, because membership in the protected *age* group is not membership in a *minority* group. To the contrary, everyone fortunate enough to enjoy a modicum of longevity will become a member of the protected age group.

Thus, Daka says, "even if references to Breiner as 'old man' or 'old fart' may have been impolite, they simply cannot be given the same legal significance as calling a woman a 'bitch' ... or using ... derogatory or hateful slurs and epithets" against members of another race.

We reject this argument, mainly because it is made in the wrong forum. The DCHRA prohibits *all* discrimination based on thirteen listed factors, including race, sex, and age. D.C.Code § 1–2512(a). It does not draw any distinction among these thirteen factors, nor does it even hint that certain types of discrimination are deemed more serious than others. On the contrary, it makes unlawful all discrimination in the workplace in any of the thirteen categories. Since the Council of the District of Columbia has not seen fit to classify different types of discrimination in the manner suggested by Daka, this court is not free to declare that some kinds of discrimination are more or less unlawful than

---

**19.** In *Douglas v. Pierce,* 707 F.Supp. 567 (D.D.C. 1988), *aff'd without opinion,* 285 U.S.App. D.C. 89, 906 F.2d 783 (1990), the United States District Court for the District of Columbia implicitly recognized the existence of an age-based hostile environment claim, but it is unclear from the court's opinion whether the plaintiff's claim was filed under the DCHRA or the ADEA. In any event, the court granted summary judgment in favor of the employer, holding that the plaintiff had failed to present a *prima facie* case, and that the evidence did not "give any indication that [the] alleged hostility was as a result of plaintiff's age." 707 F.Supp. at 573.

other kinds. If Daka (or anyone else) believes the statute should so provide, the place to seek recourse is the legislature, not the courts.

### B. *Sufficiency of the evidence*

■ Daka contends that its motion for judgment n.o.v. should have been granted. Because "[a] judgment notwithstanding the verdict is proper only in 'extreme' cases," *Oxendine v. Merrell Dow Pharmaceuticals, Inc.,* 506 A.2d 1100, 1103 (D.C.1986), we review the denial of such a motion deferentially. "Reversal is warranted only if 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" *Arthur Young & Co. v. Sutherland, supra,* 631 A.2d at 363 (citations omitted); *accord, e.g., Clement v. Peoples Drug Store, Inc.,* 634 A.2d 425, 427 (D.C.1993) (citing cases). In this case Breiner had to prove that he was subjected to unwelcome harassment based on his age, and that this harassment was so severe or pervasive as to alter the conditions of his employment by creating a hostile or abusive working environment. We hold that the evidence was sufficient to meet this burden of proof.

### 1. *Unwelcome conduct*

Daka's strongest argument is that the evidence at trial showed that Breiner welcomed comments about his age. "Unwelcome" conduct is conduct which the employee did not solicit or invite and which the employee regarded as undesirable or offensive. *Howard University v. Best, supra,* 484 A.2d at 978. It is true, as Daka says, that much of the evidence on this issue was controverted. The record reveals that Breiner sometimes referred to himself in relatively mild age-related terms such as "old man" or "old school," but it is less clear who initiated these remarks. Breiner and Neff both testified that Sakell uttered disparaging remarks first;[20] Sakell and Leyseth testified to the contrary. What is obvious, however, is that even if Breiner did invite innocuous epithets such as "old man" or "old school," the subse-

quent ridicule he received was much more egregious and offensive. It is also evident that Breiner sought to discourage this behavior by making it well known, especially to Mr. Sakell, that he found these insults inappropriate. On three separate occasions Breiner approached Sakell and told him his comments were "against the law" or "illegal." But Sakell was undeterred by these complaints and, if anything, became more abusive toward Breiner. Not only did he insult Breiner in front of, and directly to, Breiner's subordinates, but he also condoned Reeves' improper conduct. Viewing the evidence in the light most favorable to Breiner, as we must, we conclude that there was sufficient evidence that the age-related comments were unwelcome, notwithstanding Daka's evidence to the contrary. On this point there was clearly an issue for the jury to resolve.

### 2. *Severe and pervasive abuse*

■ There is no dispute that the conduct of Sakell and others was based on Breiner's age. Daka maintains, however, that it was not sufficiently severe to warrant damages under the DCHRA. We find this argument wanting. Although the *Harris* and *Best* standards are not "mathematically precise," *Harris, supra,* 510 U.S. at 22, 114 S.Ct. at 371, whether an environment is hostile or abusive can be determined by considering several factors, none of which in itself is dispositive. According to the Supreme Court, these may include:

> the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

---

20. Neff, however, was not hired until January 1991, so he would not have been present at the

beginning of Breiner's tenure in April 1990.

*Id.* at 23, 114 S.Ct. at 371.[21] Reduced to essentials, "the test is not whether work has been impaired, but whether working conditions have been discriminatorily altered." *Id.* at 25, 114 S.Ct. at 372 (Scalia, J., concurring); *accord, Oncale v. Sundowner Offshore Services, Inc.,* —— U.S. ——, ——, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (citing *Harris* ); *Meritor, supra,* 477 U.S. at 67, 106 S.Ct. at 2405. In this case the evidence was sufficient to show that they were.

Breiner described a series of events which occurred with significant frequency. The repetitive age-based slurs directed toward him were sufficiently pervasive to alter Breiner's working conditions. They were demeaning from both an objective and a subjective point of view. Concededly, some of the remarks, such as "old timer" or "old fogey," were rather innocuous. But other comments, especially those uttered by Sakell and Reeves, could reasonably be found to have been intentionally malicious. To question Breiner's sexual prowess and his ability to perform his job in front of both customers and subordinates was intolerable. The evidence also showed that Sakell's persistent ridicule seriously undermined Breiner's ability to manage the cafeteria staff. Junior employees, such as Reeves and McKenna, began to emulate Sakell, treating Breiner in a similarly abusive fashion. The combined effect of these insults was a serious decline in Breiner's morale and job performance. He testified that he felt inadequate and incompetent, and that the insults about his age "started to bother," "irritate" and "really hurt" him. It was clear from Breiner's numerous protests to Sakell and Reeves that he did not appreciate or welcome their age-based harassment. Viewing the evidence in the light most favorable to Breiner, as we must, we hold that it was sufficient to go to the jury on the question of whether this harassment altered the conditions of Breiner's working environment.

The Supreme Court held in *Meritor* "that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult." 477 U.S. at 65, 106 S.Ct. at 2405 (citations omitted). We see no reason not to recognize this same right under the DCHRA. Indeed, this court has stated, in a DCHRA case, that an employee has "the right to work in a decent environment and to earn a fair livelihood based on merit...." *Arthur Young & Co. v. Sutherland, supra,* 631 A.2d at 373. From the record before us, a jury could reasonably find that Breiner's workplace was permeated with the kind of "intimidation, ridicule, and insult" which *Meritor* forbids, and that it was "sufficiently severe or pervasive 'to alter the conditions of [his] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405 (citations omitted). We therefore hold that the trial court did not err in denying Daka's motion for judgment n.o.v.

### III. Punitive Damages

Daka asks us to reverse the award of punitive damages on several grounds. None of its contentions persuades us that reversal is appropriate.

#### A. *Availability of punitive damages as a matter of law*

Daka first asserts that the trial court erred as a matter of law because "punitive damages may not be awarded under the DCHRA for a hostile environment claim based on age-related comments...." Despite our decision in *Arthur Young & Co. v. Sutherland, supra,* which held *without qualification* "that punitive damages are available in civil actions under the DCHRA," 631 A.2d at 372, Daka contends that this holding "does not necessarily extend to claims of age discrimination" since the cause of action in *Sutherland,* a claim of sex discrimination, could have also been brought under Title VII. Daka asserts that because the *Sutherland* decision made "no mention ... of what remedies might be available for age discrimination claims," and because the DCHRA is substantially patterned after federal law (which does not permit an award of punitive damages for age

---

**21.** The *Harris* factors are consistent with those discussed in *Best*. These include "the amount and nature of the conduct, the plaintiff's response to such conduct, and the relationship between the harassing party and the plaintiff. In other words, the totality of the circumstances must be considered." *Best,* 484 A.2d at 981 (footnote omitted).

discrimination claims),[22] the trial court erred in permitting the jury even to consider an award of punitive damages. We emphatically reject this narrow reading of *Sutherland.*

In *Sutherland* this court, after examining the legislative history of the DCHRA, concluded that the legislature had specifically patterned the statute after *both* Title VII (which did not then allow punitive damages[23]) *and* the predecessor of 42 U.S.C. § 1981 (the Civil Rights Act of 1866, as amended in 1870, which did allow punitive damages). *Id.* at 370–372. Given the legislative history of the DCHRA and the "broad statutory language [in D.C.Code § 1–2556(b) ] allowing the court to award 'such relief as it deems appropriate,' " *id.* at 372, we held in *Sutherland* "that the Council of the District of Columbia, in enacting the DCHRA, intended to include punitive damages in the arsenal of available remedies for discrimination." *Id.* at 371.

■ Contrary to Daka's contention, there is nothing in the holding of *Sutherland* to suggest that it was limited solely to sex discrimination claims. Subsequent cases arising under the DCHRA have drawn no such distinction. *See Reese v. United States,* 24 F.3d 228, 232 (Fed.Cir.1994) (gender discrimination and sexual harassment); *Shepherd v. American Broadcasting Cos.,* 862 F.Supp. 486, 500 (D.D.C.1994) (racial and sexual discrimination), *vacated on other grounds,* 314 U.S.App. D.C. 137, 62 F.3d 1469 (1995). Daka's attempt to bolster its argument by analogizing the DCHRA to the ADEA must fail because the ADEA specifically limits its enforcement, *see* 29 U.S.C. § 626(b), while the DCHRA does not. We are convinced that an award of punitive dam-

ages in an appropriate case under the DCHRA would serve the statute's "broader purpose of eliminating discrimination in society." *Holt v. Life Care Services Corp.,* 121 Daily Wash. L. Rptr. 1517, 1522 (D.C.Super.Ct.1993). Accordingly, to dispel any lingering doubts, we now explicitly hold that punitive damages are available in *all* discrimination cases under the DCHRA, "subject only to the general principles governing any award of punitive damages." *Sutherland,* 631 A.2d at 372 (citation omitted).

### B. Factual support for the punitive damages award

We turn to Daka's alternative argument that there was insufficient evidence of "the indispensable element of malice" to support the jury's award of punitive damages. Daka insists that the record "contains a wealth of evidence of good faith" on its behalf, precluding exemplary damages. We disagree with Daka's assessment of the evidence.

■ The twofold purpose of punitive damages is to punish unlawful conduct and to deter its repetition. *See BMW of North America, Inc. v. Gore,* 517 U.S. 559, 567, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996); *Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 1041, 113 L.Ed.2d 1 (1991);[24] *Sutherland, supra,* 631 A.2d at 372. This court has held, therefore, that punitive damages may be awarded only when the defendant acted with a mental state which in *Sutherland* we characterized as "evil motive or actual malice." *Id.* Other cases have used different language, but they all make clear that the requisite mental state goes well beyond a mere intention to be annoying or unpleasant. *E.g., Vassiliades v.*

---

22. Age discrimination claims cannot be brought in the federal courts under Title VII or 42 U.S.C. § 1981. Instead, such claims must be brought under the ADEA, which provides for only two types of damages, back pay and liquidated damages in an amount equal to the amount of back pay. *See Commissioner v. Schleier,* 515 U.S. 323, 325–326, 115 S.Ct. 2159, 2161–2162, 132 L.Ed.2d 294 (1995).

23. In November 1991 Congress authorized, for the first time, awards of punitive damages in certain circumstances in Title VII actions. *See* 42 U.S.C. § 1981a (a)(1), (b)(1) (1994).

24. As the Court noted in *Haslip,* 499 U.S. at 15–18, 111 S.Ct. at 1041–1043, punitive damage awards have long been a part of the common law and antedate even the Constitution. Indeed, the concept of punitive damages appears to be much older than the common law. *See, e.g.,* Exodus 22:7 ("If a man delivers to his neighbor money or goods to keep, and it is stolen out of the man's house, then, if the thief is found, he shall pay double").

*Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc.,* 492 A.2d 580, 593 (D.C.1985) ("outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights" (citations omitted)); *Harris v. Wagshal,* 343 A.2d 283, 288 (D.C.1975) ("willful and outrageous conduct"). In general, this state of mind "need not (and usually cannot) be proven by direct evidence, but may be inferred from all the facts and circumstances of the case.... Once the necessary malice is established, the amount of punitive damages is left to the jury's discretion." *Robinson v. Sarisky,* 535 A.2d 901, 906 (D.C.1988) (citations omitted).

■ In this case, although the issue is a fairly close one, we are satisfied that there was sufficient evidence of malice or evil motive to support the jury's award of punitive damages.[25] Because there was no formal grievance procedure at Daka, Breiner directly told Sakell, at least three times, to stop making age-based comments because they were "against the law" or "illegal." Instead, Sakell persisted in his ridicule, condoned or encouraged other Daka employees when they made similar remarks, and did nothing to improve the workplace environment. The tone and context of all the remarks, taken together, would support a finding that Sakell deliberately intended to humiliate and embarrass Breiner, even though he knew (because Breiner told him) that his remarks were unlawful. Indeed, the fact that Sakell persisted in his hostile comments even after Breiner urged him to stop is perhaps the strongest single piece of evidence supporting the jury's finding of malice. As in *Suther-*

*land,* "the evidence did not merely show that [Daka] was a rather unpleasant place for [older employees] to work because of the benighted attitudes of some of the senior staff." 631 A.2d at 372–373.

> Rather, it established that supervisory personnel both participated in and otherwise condoned conditions in which [Breiner was] subjected to [age-based] comments on a regular basis. This offending conduct was not the product of chance, mistake, or ignorance. It manifested itself in one of the most pernicious ways possible: by depriving its victim[ ] of the right to work in a decent environment....

*Id.* at 373. Viewed in the light most favorable to Breiner, the evidence was sufficient to support a finding by a reasonable jury that Sakell's—*i.e.,* Daka's—conduct was accompanied by the requisite degree of malice or evil motive to justify an award of punitive damages.

## IV. Remittitur

Finally, Daka contends that the trial court abused its discretion in denying its motion for a remittitur of the compensatory and punitive damage awards. The court rejected Daka's arguments that the jury's award of compensatory damages was not supported by the evidence and that the award of punitive damages was grossly excessive, concluding instead that the sums awarded were "reasonable" in light of the jury's finding that Breiner had met his burden of proving a hostile work environment.

> *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995) (citations omitted), *cert. denied,* — U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 217 (1997).
> The trial court here did not instruct the jury that clear and convincing evidence was the proper evidentiary standard for determining the requisite state of mind. We note, however, that this case was tried before we issued our decision in *Jonathan Woodner,* at a time when the law was still unsettled. Because this issue was not preserved in the trial court, we decline—as we declined in *Dyer v. William S. Bergman & Associates, Inc.,* 657 A.2d 1132, 1139 (D.C.1995)—to consider Daka's claim of error. *See Jonathan Woodner,* 665 A.2d at 937 (discussing *Dyer* ).

---

25. Daka argues, for the first time on appeal, that Breiner failed to establish malice or evil motive by clear and convincing evidence. The relevant standard of proof has only recently been decided by this court:

> [I]n order to sustain an award of punitive damages, the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent.... [T]he jury must be instructed that punitive damages may be awarded only if it is shown by clear and convincing evidence that the tort committed by the defendant was aggravated by egregious conduct and a state of mind that justifies punitive damages.

"This court will not reverse the trial court's denial of a motion for ... remittitur unless the trial court has abused its discretion." *Safeway Stores, Inc. v. Buckmon,* 652 A.2d 597, 606 (D.C.1994) (citations omitted). Moreover, "[w]e are particularly reluctant to substitute our judgment for that of the trial judge who was present at and observed the entirety of the ... trial." *Capitol Hill Hospital v. Jones,* 532 A.2d 89, 93 (D.C.1987); *see Safeway Stores, Inc.,* 652 A.2d at 606 (trial judge "heard and considered all the evidence, and was in the best position to evaluate the propriety of the verdict").

A trial court has discretion to grant a remittitur when the verdict is so large that it is "beyond all reason or ... so great as to shock the conscience." *Williams v. Steuart Motor Co.,* 161 U.S.App. D.C. 155, 166, 494 F.2d 1074, 1085 (1974) (citation omitted); *accord, e.g., International Security Corp. v. McQueen,* 497 A.2d 1076, 1081 (D.C.1985); *Vassiliades, supra,* 492 A.2d at 594; *Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 687 (D.C.1977) (citing *Williams*). In such a case, however, the verdict must be "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Graling v. Reilly,* 214 F.Supp. 234, 235 (D.D.C. 1963). While Daka and Breiner both cite cases involving higher or lower damage awards to bolster their contentions about this verdict, we have held that excessive verdicts should not be measured strictly on a comparative basis. Instead,

> [e]ach case in this area necessarily rises or falls on its own facts and the trial court in ruling on the question of whether or not a jury verdict is excessive must determine on the totality of facts before it whether it was the result of passion, prejudice, or mistake.

*May Department Stores v. Devercelli,* 314 A.2d 767, 775 (D.C.1973); *see also Safeway Stores,* 652 A.2d at 606.

### A. Compensatory damages

With respect to the $10,000 compensatory damages award, Daka argues that trial court abused its discretion because "the evidence showed that the emotional distress suffered by Breiner as a result of the hostile work environment, if any, was too insignificant to justify the jury's award...." We disagree. "Throughout the trial, the jury heard testimony evincing the individualized intangible injury that [Breiner] suffered— namely, humiliation and other emotional harm." *Carter v. Duncan–Huggins, Ltd.,* 234 U.S.App. D.C. 126, 139, 727 F.2d 1225, 1238 (1984). Breiner testified that the insulting behavior of his supervisor and co-workers made him feel inadequate and inept. His wife said that he suffered both mentally and physically in the weeks before he was fired.[26] The derogatory comments to which Breiner was subjected on a regular basis, especially those of Mr. Sakell, "constitute the stuff of which a claim for humiliation and emotional harm is composed." *Id.* (citations omitted). Given our limited and highly deferential scope of review and the trial court's broad discretion, we have no basis for holding that the compensatory damages award was excessive. "We are satisfied that ... the award reasonably reflected injuries which [Breiner] actually suffered despite their intangibility." *Id.*

### B. Punitive damages

Daka argues that the trial court abused its discretion in denying its motion for a remittitur of the punitive damage award, which was thirty-nine times the amount of compensatory damages. According to Daka, this award "fails fundamental standards of fairness and due process, and is not justified by the purposes punitive damages are designed to serve." The trial court ruled, however, that the jury's award of punitive damages was not excessive, noting that it was less than five percent (actually less than three percent) of

---

26. Daka contends that Mrs. Breiner's testimony should be disregarded in assessing the jury's award of compensatory damages because she "never testified, and could not testify, that the changes in [her husband's] mood or behavior that she described were caused by a hostile environ-

ment." We find no merit in this argument. The credibility of Mrs. Breiner and the weight to be accorded to her testimony, in light of all the other evidence—particularly Mr. Breiner's testimony, which his wife corroborated—were matters exclusively within the province of the jury.

Daka's gross income at the worksite.[27] "That the punitive award is thirty-nine … times the compensatory award is thus insufficient reason to disturb the jury's wisdom in matters of human relations and behavioral modification, matters the jury sits superbly qualified to judge."

■■■■ "Because the purpose of punitive damages is to punish a tortfeasor and deter future conduct, the amount of such damages should be enough to inflict punishment, while not so great as to exceed the boundaries of punishment and lead to bankruptcy." *Jonathan Woodner, supra* note 25, 665 A.2d at 941 (citations omitted); *see also BMW of North America, Inc. v. Gore, supra,* 517 U.S. at 567, 116 S.Ct. at 1595. Although there is no "mathematical bright line" for determining whether a particular award is constitutionally fair, *Pacific Mutual Life Insurance Co. v. Haslip, supra,* 499 U.S. at 18, 111 S.Ct. at 1043, as a matter of due process such awards must not be "grossly out of proportion to the severity of the offense and have some understandable relationship to compensatory damages." *Id.* at 22, 111 S.Ct. at 1045.[28] But such disproportion must be clearly shown. "Only when an award can fairly be categorized as 'grossly excessive' in relation to [legitimate punitive] interests does it enter the zone of arbitrariness that violates [due process]." *Gore,* 517 U.S. at 568, 116 S.Ct. at 1595.

■■■ Under the Supreme Court's recent decision in *Gore,* the reasonableness of an award of punitive damages is to be determined by three "guideposts": (1) the reprehensibility of the defendant's conduct, (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages and any potential civil or criminal penalties. *Id.* at 573, 116 S.Ct. at 1598; *see also Haslip, supra,* 499 U.S. at 23–24, 111 S.Ct. at 1046–47; *TXO*

*Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993). Following these guideposts, we reject Daka's contention that the damages awarded in this case were so grossly excessive as to deprive them of due process of law.

First, a reasonable jury could surely find that Daka's conduct in this case was sufficiently reprehensible to merit a sizable sanction. The evidence showed that an unprofessional atmosphere of insult and ridicule permeated Daka's worksite. Most of the harmful conduct in this case involved upper management, *i.e.,* Mr. Sakell; those incidents not directly involving Sakell could not have escaped Daka's notice. When Breiner complained to Sakell about his remarks and told him that they were unlawful, Sakell's response was to continue the insults. The trial court concluded that Breiner "was subjected to severe and pervasive abusive conduct" and that Sakell's actions "substantially diminished [Breiner's] ability to be effective, let alone comfortable or fulfilled."

Second, Breiner was found to have actually suffered in the amount of $10,000. While the ratio of punitive to compensatory damages, thirty-nine to one, may "raise a suspicious judicial eyebrow," *TXO, supra,* 509 U.S. at 481, 113 S.Ct. at 2732 (O'Connor, J., dissenting), the Supreme Court in *TXO* upheld an award of $19,000 in compensatory damages and $10 million in punitive damages, a ratio of more than five hundred to one. In *Gore,* on the other hand, the Court reversed an award of $4,000 in actual damages and $2 million in punitive damages, a ratio of five hundred to one. Read together, *TXO* and *Gore* reaffirm what the Court said in *Haslip:* "We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." 499

---

**27.** Sakell testified that $8.5 million was Daka's "annual income" from the Smithsonian account, but did not specify (because he was not asked) whether that was a gross or net figure. However, because the punitive damages award was such a tiny percentage of that amount, our decision does not depend on whether it was gross or net; it would be the same either way.

**28.** To the extent that this court held in *Robinson v. Sarisky, supra,* that "punitive damage amounts need not bear any relation to compensatory damages," 535 A.2d at 907, that statement must be read in light of the subsequent Supreme Court decisions in *Haslip* and *Gore.*

U.S. at 18, 111 S.Ct. at 1043.[29] Moreover, Sakell testified that Daka made $8.5 million a year at the three Smithsonian sites *alone*. As the trial court noted, the $390,000 punitive damages award represents a mere 2.9 percent of Daka's income from the Smithsonian during the time of Breiner's employment. Because it is so small in relation to Daka's total income, we conclude that it does not "exceed the boundaries of punishment and lead to bankruptcy." *Jonathan Woodner, supra* note 25, 665 A.2d at 941.

Third, we look to the difference, if any, between the punitive award and the civil or criminal penalties authorized. While the DCHRA does not limit allowable damages, federal law caps all damage awards for employment discrimination under Title VII at $300,000 when the employer has more than 500 employees, as Daka does. *See* 42 U.S.C. § 1981a (b)(3)(D) (1994). But Title VII is not the only source for the DCHRA, as we explained in *Sutherland,* 631 A.2d at 371–372. Therefore, although we often look to Title VII for guidance when interpreting the DCHRA, we are not necessarily bound by Title VII's strictures, particularly when it comes to damages (again as we explained in *Sutherland* ). Of course, the total amount of damages awarded here, $400,000, is above the maximum available under Title VII. But because of the need to deter future misconduct of the sort presented on this record, we think the additional $100,000 is not so excessive as to render the jury's award unconstitutional, especially when there is no ceiling on the damages available under the 1866 and 1870 Civil Rights Acts on which the DCHRA is also based.

Thus, under all the circumstances, and particularly in light of the Supreme Court decisions in *Gore, TXO,* and *Haslip,* as well as our own case law governing punitive dam-

ages generally, we hold that the jury's award of punitive damages was not excessive. We note also that the jury was properly instructed—without objection—on when punitive damages are appropriate, what their purpose is, and what to consider in fixing their amount. The instruction also told the jury to use "calm discretion and sound reason" and not to be "influenced by sympathy for or dislike of any party in the case." See note 12, *supra.* Such an instruction, in our view, weighs strongly in favor of the reasonableness of the award.

For these reasons we find no abuse of discretion in the trial court's denial of Daka's motion for remittitur.

## V. CONCLUSION

The judgment of the trial court is in all respects

*Affirmed.*

STEADMAN, Associate Judge, concurring in part and dissenting in part:

"The mere finding of discriminatory action, without more, will not support an award of punitive damages." *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 372 (D.C.1993). Indeed, punitive damages are "not favored in the law." *See Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.1982) (citing *Price v. Griffin,* 359 A.2d 582, 589 (D.C.1976)). As a civil fine without easily defined boundaries, imposed on an individual basis by individual juries, they are the exception, not the norm.

I think this fact reflects a broader principle; namely, that in order to trigger an award of punitive damages, the conduct in question cannot simply be that required to impose liability in the first place.[1] Rather,

---

**29.** The Supreme Court in *Gore,* after "reject[ing] the notion that the constitutional line is marked by a simple mathematical formula," went on to say:

Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value

of noneconomic harm might have been difficult to determine.

517 U.S. at 582, 116 S.Ct. at 1602.

**1.** Admittedly, we have wavered a bit on this point. *See Dyer v. William S. Bergman & Assocs., Inc.,* 657 A.2d 1132, 1139 n. 10 (D.C.1995) ("Arguably, where the tort alleged is an intentional one, inherently containing elements of willfulness, an award of punitive damages must rest upon that tort being committed in an outrageous way; in other words the 'outrageousness' cannot

as we have said, an award of punitive damages requires a showing of "extreme aggravation." *Id.* at 37. The conduct in question must be characterized by "evil motive, actual malice, deliberate violence or oppression," or it must be "outrageous ... in willful disregard for another's rights." *Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C.1988) (internal quotations omitted). It must be perpetrated "maliciously, wantonly, oppressively, or with a spirit of mischief or criminal indifference to civil obligations." *Chesapeake & Potomac Tel. Co. v. Clay*, 90 U.S.App. D.C. 206, 210, 194 F.2d 888, 892 (1952).

Before us is a "discriminatory hostile environment" case. To succeed at all, this cause of action requires a workplace " 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Oncale v. Sundowner Offshore Servs., Inc.*, — U.S. —, —, 118 S.Ct. 998, 1001, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)).

The majority opinion strikingly describes the impermissible abuse to which Breiner was subjected. In assessing the question of recoverable damages, however, several factors should be noted. First, Breiner was a fairly high-ranking official in the employer's service, who a month before his discharge— which the jury expressly found to be unrelated to age discrimination—received both a raise and a substantial bonus. During his tenure he was subjected to a series of verbal taunts, but of a generic type which, in significant part, can be found on any birthday card rack in the nation, and from which probably no aging male has been totally immune. Moreover, age, unlike any of the other bases of discrimination outlawed by the Human Rights Act, is a universal condition, a fact which, perhaps, renders comments about age less invidious and susceptible to a higher

threshold of tolerance. The hostile environment in this case was created solely by words; no physical misconduct or discriminatory actions were demonstrated. In various instances, Breiner actively used some of the same hostile language he now complains of. The fact that Breiner had supervisory power over Reeves and McKenna, but did not attempt to discipline them for their insubordinate behavior, is relevant to how severe Breiner himself viewed their conduct.

Nonetheless, I agree with the majority that the conduct here, especially that of his immediate superior, was sufficiently "severe or pervasive" to form the basis for a jury finding of liability. Where I part company is in the proposition that the proven conduct was sufficiently aggravated to justify the award of $390,000 in punitive damages. I do not think the jury finding of "evil intent or actual malice" in the circumstances here, without more, adds significantly to the equation. Where "discriminatory intimidation, ridicule and insult" of a "severe or pervasive" nature are necessary components of the hostile environment, it is not easy to imagine a situation where some sort of intent or malice would not be present.

Even if some amount of punitive damages may be properly awardable in this case, we have here $10,000 in compensatory damages coupled with $390,000 in punitive damages, a 39 to 1 ratio. I do not think such a disparity can readily survive the test recently articulated by the Supreme Court to assess the reasonableness of a punitive damages award. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996). Most troublesome are the factors concerning the reprehensibility of the defendant's conduct and the ratio between actual or potential harm suffered and the punitive damages award. *Id.* at 575, 116 S.Ct. at 1598. For the reasons already discussed, I would not hold that Daka's conduct here was sufficiently reprehensible—beyond that necessary to establish liability—to merit

be supplied by the conduct required to commit the tort itself."); *cf. Washington Med. Ctr. v. Holle*, 573 A.2d 1269, 1288 (D.C.1990) ("Our cases suggest that where outrageous or malicious conduct is the gravamen of the underlying tort, the same conduct can also satisfy the require-

ment of 'aggravation' of the injury, 'since it is by definition ... conduct which society finds intolerable, and seeks to deter.' ") (quoting *Sere, supra*, 443 A.2d at 37–38); *Harris v. Wagshal*, 343 A.2d 283, 288 (D.C.1975).

$390,000 in punitive damages. As the Court noted, in accordance with the principle that I have already alluded to, "that conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages does not establish the high degree of culpability that warrants a substantial punitive damages award." *Id.* at 580, 116 S.Ct. at 1601.

Equally, if not more important, "punitive damages may not be 'grossly out of proportion to the severity of the offense.'" *Id.* at 576, 116 S.Ct. at 1599 (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991)). "The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree." *Id.* at 580, 116 S.Ct. at 1601. As we have recently held, punitive damages must have an anchor in the existence of compensatory damages. *Maxwell v. Gallagher,* 709 A.2d 100, 103 (D.C.1998). I think that such an anchor must extend to substantial proportionality with the latter's generally more concrete element of damages, so as to provide some meaningful standard of measurement. Constitutional extremes should not be deemed the only consideration here; punitive damages, a common-law concept, may entail common-law standards as well. A 39 to 1 ratio must, as the majority says, raise a suspicious judicial eyebrow. I would go further; in the circumstances here, given the significant obligation of judicial review,[2] I do not think that the imposition of such a disproportionately high punitive award can be sustained.

I might add that, in retrospect, I harbor considerable doubt that our decision in *Sutherland, supra,* 631 A.2d at 370–72, properly held that punitive damages are available in court-initiated hostile environment cases under the Human Rights Act. The Act itself is, in express terms, silent on the subject. The Office of Human Rights, the agency primarily responsible for administering the Act, has no power to impose punitive damages. It seems to me that if the legislature determines that conduct previously licit is to be made the subject of future liability, it is incumbent upon the legislature to determine whether, in addition, that conduct is to be deemed so reprehensible as to be subject to the equivalent of a civil fine, and explicitly so provide. Furthermore, the legislature can best tailor the amount of punitive damages and the circumstances under which they are to be awarded. This is what Congress has done with respect to Title VII of the Civil Rights Act of 1964—the legislation which provides the basis for recovery of hostile environment damages for many federal claimants—and, albeit less clearly, in the Age Discrimination in Employment Act. *See* 42 U.S.C. § 1981a (a)(1), (b) (1994) (providing cap for punitive damages in Title VII cases); 29 U.S.C. § 626(b) (1985) (citing 29 U.S.C. § 216(b) (Supp.1998)) (providing for "liquidated" damages equal to unpaid wages for willful violations of the ADEA). And of course legislatures do this routinely when a new offense is created that is made punishable by a criminal fine or by a civil fine imposed by the government.

I regret I cannot join my colleagues in affirming the punitive damages award here.

---

**2.** *See Gore, supra,* 517 U.S. at 587, 116 S.Ct. at 1604 (Breyer, J., concurring) (quoting *Haslip, supra,* 499 U.S. at 20–21, 111 S.Ct. at 1044–45), noting the Court's emphasis

upon the constitutional importance of legal standards that provide "reasonable constraints" within which "discretion is exercised," that assure "meaningful and adequate review by the trial court whenever a jury has fixed the punitive damages," and permit "appellate review [that] makes certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition."